# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### April 3, 2001 Session

# TRINITY INDUSTRIES, INC. v. MCKINNON BRIDGE COMPANY, INC., ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 95-3587-III(II)    Carol L. McCoy, Chancellor

---

### No. M2000-00510-COA-R3-CV - Filed November 28, 2001

---

An uncompleted highway bridge over the Tennessee River collapsed, triggering a lengthy and convoluted course of litigation between the parties involved in its construction. Litigation began when the company that fabricated the bridge's structural steel components sued the general contractor for non-payment on the contract. The general contractor filed a counter-claim which alleged that the fabricator had breached the contract by producing defective steel components that caused the collapse. The contractor named some of its other subcontractors as third party defendants, claiming that they also bore some responsibility for the collapse of the bridge. In a series of orders, the trial court dismissed the counterclaim and third party claims, and declared that its judgments were final for purposes of Tenn. R. Civ. P. Rule 54.02. After this court heard oral argument on the first of the Rule 54.02 appeals, but before it could issue an opinion, the trial court conducted a hearing on the merits of the steel fabricator's claim, and rendered a judgment in its favor. We affirm the judgment for the price of the steel and the judgment for the fabricator on the general contractor's counterclaim. We reverse the judgment dismissing the third party claims.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Reversed in Part; Affirmed in Part; and Remanded

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J., and J. S. DANIEL, SP. J., joined.

Don L. Smith, Donald N. Capparella, John W. Heacock, and Kenneth S. Schrupp, Nashville, Tennessee, for the appellant, McKinnon Bridge Company, Inc.

Kenneth S. Schrupp, Nashville, Tennessee, for the appellant, Safeco Insurance Companies.

David L. Johnson, Hugh C. Howser, Jr. and Mary Ellen Morris, Nashville, Tennessee, for the appellee, Trinity Industries, Inc.

Mary G. Moody, Nashville, Tennessee, for the defendants/appellees, Bruce J. Saltsman, Sr. and Tennessee Department of Transportation, and defendant, State of Tennessee.

David Key Taylor, Nashville, Tennessee, for the defendant/appellee, E. L. Conwell & Company.

Stephen A. Cobb, Nashville, Tennessee, for the defendant, Tensor Company.

John Wingo and M. Clark Spoden, Nashville, Tennessee, and Vincent G. Torpy, Jr., Melbourne, Florida, for the defendant/appellee, Tensor Engineering Company.

## OPINION

### I.
#### COLLAPSE OF A HIGHWAY BRIDGE

Appellant McKinnon Bridge Company (McKinnon Bridge) is a general contractor primarily involved in heavy construction and bridge construction. Appellee Trinity Industries, Inc. is a steel fabricator and was the supplier of structural steel to McKinnon Bridge for use in building the bridge at issue in this case.

The relationship between the parties began in the fall of 1993 after the state of Tennessee entered into a contract with McKinnon Bridge as its general contractor to build a bridge in West Tennessee over the Tennessee River at State Highway 69. Soon thereafter, on September 3, 1993, Trinity submitted a four-page proposal to McKinnon Bridge to supply fabricated steel for the bridge. Ben McKinnon, as president of McKinnon Bridge, accepted the "Bid Proposal" with certain adjustments by signature dated April 11, 1994. On that same day, the parties executed a "Supply Contract" wherein Trinity agreed to furnish steel for the bridge in consideration of $2,535,000.00. Thus the contractual agreement between Trinity and McKinnon Bridge consists of these two documents, the Supply Contract and the Bid Proposal.

During construction, McKinnon Bridge discovered that several of the girders and cross-frame stiffeners supplied by Trinity contained misaligned holes, which prevented proper erection and assembly of the bridge. After the general contractor notified Trinity of the problem, the parties agreed on a remedial plan which was approved by the State. Trinity's representatives went to the job site and re-drilled the holes. The re-drilled holes were approved by McKinnon Bridge. The general contractor claims that it subsequently encountered other problems with the steel such as wrong length, lack of proper curvature, dimensional and fitting errors, and poor quality. It is clear from Ben McKinnon's testimony, however, that none of the steel received from Trinity was ever rejected prior to the collapse. On May 16, 1995, the partially erected bridge collapsed.

After the collapse of the bridge, McKinnon Bridge retained experts, some of whom concluded that the steel provided by Trinity was defective and caused the structure's collapse.

Therefore, the general contractor ceased payment on the contract for that steel. Around this time, the State informed Mr. McKinnon that McKinnon Bridge could reconstruct the bridge with steel from Trinity that it had in storage, as long as certain modifications were made to this steel. The State agreed to pay for the changes.

It is undisputed that McKinnon Bridge ordered replacement steel from another supplier without ever requesting Trinity to repair or replace the allegedly defective steel. When asked why his company did not use the steel from Trinity, Mr. McKinnon stated that it would have been necessary for the steel

> "to have been picked up [and] taken to Carolina . . . where it was fabricated -- and all that freight and allowance, and I made a decision not to use it . . . . Cost was some consideration. It just wasn't worth it, to get in all of the trouble you could have if it didn't work. I would be responsible. They have already put the responsibility on McKinnon Bridge Company's back for that to work, and I didn't want the responsibility."

## II.
### PROCEEDINGS IN THE TRIAL COURT

Trinity filed suit against McKinnon Bridge seeking payment for the steel in federal court. Trinity also filed this state action against McKinnon Bridge, its surety Safeco Insurance Company and the Tennessee Department of Transportation (TDOT), the owner of the bridge, seeking the sums due under its subcontract. Trinity's complaint alleged that it had provided all the material pursuant to the contract and that McKinnon Bridge had only made partial payment, leaving a contract balance of $1,582,432.26. The federal suit has been stayed pending resolution of this action.

McKinnon Bridge answered and counter-claimed against Trinity, alleging both negligence and breach of contract in furnishing steel that did not conform to the contract terms and specifications. McKinnon also added third party claims against ABC Contractors, Inc., which constructed the bridge, and against quality assurance inspectors E.L. Conwell & Co. McKinnon subsequently amended its answer, adding the State as a third party defendant, based in part on a theory of vicarious liability for the actions of E.L. Conwell & Co.

Trinity moved for summary judgment on McKinnon Bridge's counter-claim on two grounds: (1) that in a contract for the sale of goods the buyer is limited to the U.C.C. contract remedies and cannot maintain a cause of action for negligently performing the contract of sale; and (2) that the contract of sale limited McKinnon's remedies to repair or replacement of any defective goods. ABC Contractors also filed a motion to dismiss McKinnon's third party claim against it. After a hearing, the trial court granted both motions by an order filed July 28, 1997. McKinnon moved the court to amend the judgment against it, and the trial court reaffirmed its decision "to grant Trinity summary judgment on all of McKinnon Bridge's counterclaims, both in tort and in contract." The court added

that, pursuant to Tenn. R. Civ. P. 54.02, it "expressly directs and accordingly enters final judgment in favor of Trinity upon McKinnon's counterclaim and causes."

McKinnon appealed to this court. The appeal was docketed as No. M1997-00026-COA-R3-CV. McKinnon Bridge moved the trial court to continue the trial of the case until after our decision on the Rule 54.02 appeal. The trial court granted the motion over Trinity's opposition, and rescheduled the trial for September 13, 1999.

On September 10, 1998, McKinnon amended its complaint again to add Tensor Engineering Company as a third party defendant. McKinnon claimed that the shop drawings supplied by Tensor for the steel to be fabricated by Trinity were incorrect. The trial court subsequently dismissed the claim against Tensor, and certified this order as a final judgment as well. McKinnon filed its second notice of appeal, and this appeal was docketed as No. M1999-00904-COA-R3-CV.

Oral argument on the dismissal of McKinnon's counterclaims was conducted in this Court on January 6, 1999. While the appeal was still pending in this court, McKinnon filed its second motion to continue in the trial court. This time the trial court denied the motion, stating that McKinnon would not be prejudiced if the case went forward on the remaining claims while the appeals were pending. The trial court denied McKinnon's request for an interlocutory appeal of the denial of a continuance.

The trial court subsequently granted summary judgment to Conwell, and dismissed McKinnon's claims against the State. The court certified its judgment as final for purposes of appeal for the third time, and this court issued an order consolidating the second and third Rule 54.02 appeals under No. M1999-00904-COA-R3-CV.

McKinnon filed a motion in limine to exclude any evidence related to what caused the bridge to collapse. The chancellor overruled the motion and held that the cause of the collapse was relevant to whether McKinnon could revoke its acceptance after the collapse. Trial began on September 13, 1999. On the last day of trial, the chancellor ruled from the bench in favor of Trinity specifically finding that none of the nonconformities and/or defects in the steel caused or contributed to the collapse of the bridge.

On October 27, 1999, the trial court's order was filed, awarding Trinity judgment for the unpaid balance on the contract, $1,582,432.26, as well as prejudgment interest and discretionary costs in the amount of $475,137.11. The trial court's findings of fact and conclusions of law were filed on the same day. McKinnon subsequently filed a motion to alter or amend the judgment, which the court denied. The latest appeal followed.

## III.
### THE FIRST APPEAL - MCKINNON'S COUNTERCLAIM

As we have noted, Trinity's motion for summary judgment was based on two grounds: that (1) McKinnon could not sue Trinity for negligently performing the contract; and (2) that McKinnon's remedies for breach of the contract were limited to repair and/or replacement of the steel. The second defense requires us to review the contract between the parties and the circumstances under which it was executed.

The contract consists of two documents. The first is a Bid Proposal dated September 3, 1993 in which Trinity offered to supply the steel for a lump sum price of $2,535,000. The limited remedy of repair or replacement appeared in bold print in Paragraph 19:

> 19. GUARANTY & LIMITATION OF WARRANTY: THERE ARE NO WARRANTIES OF MERCHANTABILITY OR FITNESS OF THE MATERIALS TO BE FURNISHED PURSUANT HERETO WHICH EXTEND BEYOND A PERIOD OF ONE YEAR FROM THE DATE OF COMPLETION OF OUR WORK UNDER THIS CONTRACT. YOU SHALL GIVE US PROMPT NOTICE UPON DISCOVERY OF ANY SUCH CONDITIONS. OUR LIABILITY FOR ANY AND ALL LOSSES AND DAMAGES DIRECT AND CONSEQUENTIAL SUSTAINED BY YOU AND OTHERS ARISING OUT OF THE PERFORMANCE OF THIS CONTRACT SHALL BE LIMITED TO THE FURNISHING, FABRICATING AND DELIVERY OF MATERIAL ONLY OR REPLACEMENT OR CORRECTION OF DEFECTIVE OR NON-CONFORMITY OF MATERIALS WITHIN THE TIME ABOVE STATED.

The Bid Proposal also contained a list of other exclusions, one of which was "Liquidated and Consequential Damages."

On April 11, 1994, Ben McKinnon on behalf of McKinnon Bridge Company accepted the Bid Proposal by signing it and also signing an "Agreement" which accepted the Bid Proposal and made it prevail over any conflicts between the two documents "except as noted." Mr. McKinnon had crossed out and initialed the exclusion of liquidated and consequential damages in the Bid Proposal, but he did not change Paragraph 19. Section Eight of the "Agreement" accepting the Bid Proposal contained a requirement that Trinity indemnify McKinnon against "all claims for damages arising from accidents to persons or property occasioned by [Trinity]", and Section Three provides that Trinity will be liable for any damages, costs, or expenses to McKinnon which arise from delays which Trinity causes or to which it contributes. Finally, Section Three states that the rights granted to McKinnon under the Agreement are cumulative and are not intended to be in lieu of any legal right or remedy afforded by state or federal laws.

## A.

In order to escape the provisions of Paragraph 19 of the Bid Proposal, McKinnon argues that the contract is ambiguous and should be interpreted against Trinity as the party who drafted it. *See Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d 592 (Tenn. Ct. App. 1933). We think, however, that this familiar rule of construction has little application here. The Bid Proposal, the part of the contract Trinity drafted, contains very few of the claimed ambiguities, some of which we will discuss later. The ambiguities stressed most heavily by McKinnon are contained in the "Agreement" which McKinnon drew and had Trinity sign. But that same document made the Bid Proposal control any conflicts between the two documents "except as noted." As we have seen, Mr. McKinnon did note some changes in the Bid Proposal, but the exclusive remedy contained in Paragraph 19 was not changed. Therefore, to the extent that McKinnon claims rights and remedies that are greater than those contained in Paragraph 19, the contract itself resolves any ambiguities in favor of the provisions in the Bid Proposal.

## B.

McKinnon makes two other arguments focused solely on perceived ambiguities in the Bid Proposal. The first is that Paragraph 19 is in and of itself ambiguous because the first sentence of the paragraph recognizes that there are warranties of fitness and merchantability that are attached to this sale, while the last sentence disclaims these warranties. But this is not an accurate reading of the paragraph. Paragraph 19 is not a disclaimer of warranties. Rather, it limits the duration of the warranties of fitness and merchantability to one year (the first sentence) and limits the remedy for a breach of these warranties to repair or replacement of the goods (the last sentence).

The second argument about the terms included in the Bid Proposal concerns Mr. McKinnon's action in crossing out the general exclusion of incidental and consequential damages while leaving in the specific exclusion in Paragraph 19. Arguably this act created a conflict between Paragraph 19 and the provisions in Section 3 of the "Agreement" which allows McKinnon to recover for any damages, costs, or expenses for delays caused or contributed to by Trinity. But, in addition to our belief that the contract taken as a whole makes Paragraph 19 prevail, a close reading of the contract reveals that there really is no conflict between the two provisions. They deal with different things. Paragraph 19 limits remedies for furnishing <u>defective steel</u>; Section 3 allows McKinnon to recover damages for excessive <u>delays</u>. "All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." *Rainey v. Stansell*, 836 S.W.2d 117 at 118-119 (Tenn. Ct. App. 1992). The removal of the general limitation on incidental and consequential damages in the Bid Proposal removed any ambiguity with regard to McKinnon's ability to recover consequential damages for Trinity's delay, but the limitation on the remedy for furnishing defective steel survived under Paragraph 19.

## IV.
## IS PARAGRAPH 19 ENFORCEABLE?

The same section of the U.C.C. that allows the parties to limit their remedies in case of a breach also provides that the limitation is unenforceable (1) if it fails of its essential purpose, Tenn. Code Ann. § 47-2-719(2), or (2) if a limitation on consequential damages is unconscionable, Tenn. Code Ann. § 47-2-719(3).

## A.

When does the repair or replace remedy fail of its essential purpose? As a general rule the repair-and-replace remedy fails of its essential purpose when seller is unable or unwilling to repair or replace in a reasonable time. *Board of Directors v. Southwestern Petroleum Corp.*, 757 S.W.2d 669 (Tenn. Ct. App. 1988); *Kearney & Treaker Corp. v. Master Engr. Co.*, 527 A.2d 429 (N.J. 1987); *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102 (4th Cir. 1980); *Stutts v. Green Ford, Inc.*, 267 S.E.2d 919 (N.C. App. 1980). When the seller is unable or unwilling to put conforming goods in the buyer's hands within a reasonable time, it is a repudiation of the obligations of the warranty and leaves the buyer without a remedy. *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir. 1971).

In this case the undisputed proof shows that after the bridge collapsed McKinnon did not attempt to obtain repair or replacement from Trinity. A fair and adequate remedy not invoked by the buyer cannot be said to fail of its essential purpose. *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15 (Tenn. Ct. App. 1993). In *Moore v. Howard Pontiac American*, 492 S.W.2d 227 (Tenn. Ct. App. 1972), we held that the buyers were obligated to notify the seller of defects in the goods and to give the seller a reasonable opportunity to remedy the defects before the buyers were entitled to other relief. We are not prepared to say that in every case the seller must be allowed to repair or replace the goods before the buyer can assert that the limited remedy failed of its essential purpose. But the burden is on the buyer to show why he did not avail himself of the limited remedy. In this case Mr. McKinnon stated in his discovery deposition that he decided not to demand that Trinity replace the steel because it was too much trouble to deal with them.

## B.

Is the limitation on consequential damages unconscionable? This is a question of law for the court in light of the commercial setting, purpose and effect of the provision. Tenn. Code Ann. § 47-2-301.

Unconscionability may arise from a lack of a meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability). *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir. 1965). In Tennessee we have tended to lump the two together and speak of unconscionability resulting

when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

*Haun v. King*, 690 S.W.2d 869 at 872 (Tenn. Ct. App. 1984). Where the parties possess equal bargaining power the courts are unlikely to find that their negotiations resulted in an unconscionable bargain, *Royal Indemnity Co. v. Westinghouse Electric Corp.*, 385 F. Supp. 520 (S.D. N.Y. 1974), and terms that are common in the industry are generally not unconscionable. *Posttape Associates v. Eastman Kodak Co.*, 450 F. Supp. 407 (E.D. Pa. 1978); *D.O.V. Graphics, Inc. v. Eastman Kodak Co.*, 347 N.E.2d 561 (Ohio Ct. of Common Pleas 1976).

There is nothing in this record on which to base a claim that the limitation on consequential damages for any failure of the steel itself is unconscionable. Both parties were large, successful, and sophisticated businesses possessing equal bargaining power; and there is no claim that an exclusion of consequential damages is uncommon in the steel furnishing business. Therefore, we do not think the provision of the contract providing for a limited repair or replace remedy is unconscionable.

## V.
### DOES MCKINNON HAVE A NEGLIGENCE COUNTERCLAIM?

McKinnon argues that Paragraph 19, even if it is enforceable, does not apply to its tort-based counterclaim. *See Sain v. ARA Mfg. Co.*, 660 S.W.2d 499 (Tenn. Ct. App. 1983). But we think that under the circumstances of this case McKinnon does not have a negligence claim against Trinity. The counterclaim does not allege a claim for personal injury and the only reference to property damages is in one sentence: "Such damage includes but is not limited to property damage." In all of its filings in opposition to Trinity's motion for summary judgment McKinnon includes a vague allusion to damages to "personal property," but the damage to the steel itself and the attendant costs of salvage, storage, and testing comprise the bulk of the specific items of damage. These damages are "property damage" in one sense, but they are more accurately classified as "economic losses." In a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.

This doctrine was created by courts to avoid the "coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, fraud and misrepresentation on the other." James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 580 (4th ed. 1995). The economic loss doctrine draws the line between tort and warranty by barring recovery for economic losses in tort actions. *Id.* The policy behind this doctrine has been articulated as follows:

In general we indorse the idea that these losses should not be recovered in tort. For tort to intrude willy nilly into the system of liability that has been quite carefully constructed in Part 3 of Article 2 is to upset that balance. Tort permits

recoveries in circumstances where the legislature – by indorsing disclaimers, particular statutes of limitations, rules on privity, and lack of notice – has concluded that none should be permitted. We accept the economic loss doctrine as a crude proxy for the dividing line between what is tort and what is not . . . .

Putting aside injury to third parties that arises out of conventional tortious behavior and ignoring personal injury to the buyer, we see no reason why all other liability arising out of defective goods ought not be under Article 2. By hypothesis the parties to these suits negotiate with one another. If the buyer does not protect its own interest adequately, adequate backup protection is given by Article 2 doctrines such as unconscionability in 2-302, restriction of disclaimers under 2-316, and limitation on disclaimer of remedy under 2-719. Courts should be particularly skeptical of business plaintiffs who – having negotiated an elaborate contract or having signed a form when they wish they had not – claim to have a right in tort whether the tort theory is negligent misrepresentation, strict tort, or negligence.

*Id.* at 582-3.

Our Supreme Court in *Mid-South Milling Co. v. Loret Farms, Inc.*, 521 S.W.2d 586 (Tenn. 1975) recognized the differences between tort and contract in deciding the proper venue for a cause of action involving the sale of goods. Quoting from the Court of Appeals opinion the Court said:

A contract may be negligently or fraudulently breached and the cause of action remain in contract rather than in tort. In the case at bar it was not active negligent performance by the defendants that resulted in damage to the plaintiffs. Rather it was the negligent breach of warranty of sale, which in effect forestalled any performance. The cases and text writers deal with the issue with varying degrees of emphasis placed on the two aspects of the question. We conclude, however, that since the adoption of the Uniform Commercial Code, there is a vast difference between a cause of action based upon negligent breach of warranty of sale of chicken feed, as distinguished, for example, from a cause of action based upon negligent performance of a contract to construct a building; the first is governed by the Code, the latter may be brought in tort.

The plaintiffs do not sue for the price of the poultry meal. The plaintiffs sue for damages resulting from injury to personal property – their chicks which fed on the feed. Whatever may have been the former law, an action for such damage lies under the Uniform Commercial Code, particularly T.C.A. Sec. 47-2-715 where the buyer is allowed his consequential damages as a result of the seller's breach of warranty of sale, which consequential damage is defined '(2) Consequential damages resulting from the sellers breach include * * * (c) injury to the person or property proximately resulting from any breach of warranty.' The plaintiffs allege damages

in the form of money expended due to the fact their chicks did not achieve normal growth; the injury to the chicks resulted in the damages sustained.

*Id.* at 588-89. Many of the cases that follow the economic loss rule rely on *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), in which the Court said:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. *See* U.C.C. § § 2-316, 2-719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, . . . we see no reason to intrude into the parties' allocation of the risk.

476 U.S. at 872-73.

Though Tennessee does not have a definitive body of law on the economic loss doctrine, our Supreme Court expressed its agreement with the policy behind the doctrine in *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128 (Tenn. 1995). In *Ritter*, the court stated that "Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence." *Id.* at 133. In other jurisdictions, the doctrine has been well developed. Most courts hold that there is tort liability for the sale of goods only when there is either personal injury or damage to "other property"[1] which was not a part of the contract for sale. *See, e.g., City of Lennox v. Mitek Indus.*, 519 N.W.2d 330 (S.D. 1994). We interpret *Mid-South Milling* and *Ritter v. Custom Chemicides, Inc.* as standing for the principle that a breach of a contract for the sale of goods resulting in consequential damages is governed by the U.C.C. despite the fact that the pleadings allege the seller negligently performed the contract.

---

[1]There is a difference of opinion as to what constitutes "other property" to which, when injury incurs, can be the basis of a negligence cause of action. We think that the interpretation of "other property" which is most true to the policy behind the rule does not include the type of property that one would reasonably expect to be injured as a direct consequence of the failure of the defective product, as these losses are essentially damages for failed commercial expectations, or loss of the benefit of the bargain. *See Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d 1094, 1099 (8th Cir. 1996)(predicting that North Dakota would follow the "the modern trend in many jurisdictions [which] holds that tort remedies are unavailable for property damage experienced by the owner where the damage was a foreseeable result of a defect at the time the parties contractually determined their respective exposure to risk, regardless whether the damage was to the 'goods' themselves or to 'other property'"); *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 618-20 (Mich. 1992)(stating that, under Michigan law, economic loss doctrine bars claims in tort for injury to "other property if this damage was within the contemplation of the parties to the agreement such that it could have been the subject of negotiations between the parties). *But see 2-J Corp. v. Tice*, 126 F.3d 539, 544 n. 4 (3d Cir. 1997)(refusing to expand the economic loss doctrine to preclude recovery for damage to the contents of a warehouse when the warehouse collapsed.) White and Summers would include in the term economic loss all losses except "injuries to third parties that arise out of conventional tortious behavior" and "personal injury to the buyer." James J. White and Robert S. Summers, *Uniform Commercial Code*, § 10-5, 583 (4th ed. 1995).

McKinnon argues that Trinity did not raise the economic harm issue in the trial court when it made its motion for summary judgment. But, we think the substance of the argument on appeal is exactly the same that Trinity made in the trial court. Indeed, the policies behind *Mid South Milling* and *Ritter* are the same as those which inspired the economic loss doctrine.

McKinnon relies on *Sain v. ARA*, 660 S.W.2d 499 (Tenn. Ct. App. 1983) as authority for the proposition that a plaintiff may elect to sue a seller of goods in tort or contract even where the goods harmed only themselves. But McKinnon fails to appreciate that the seller in that case was not sued for the defective goods but for the harm caused by the seller's agent in negligently repairing the goods. McKinnon also cites the example given in *Loret Farms*: the negligent construction of a building which would allow the plaintiff to sue the contractor in tort or contract. That example, however, actually supports Trinity's argument by drawing a distinction between a contract for the construction of a building and a contract for the sale of goods. The Supreme Court said the latter is governed by the provisions of the Uniform Commercial Code, including its risk-allocating provisions.

## VI.
### DOES PARAGRAPH 19 VIOLATE TENN. CODE ANN. § 62-6-123?

McKinnon argues that Paragraph 19 violates a state statute that prohibits hold harmless or indemnity agreements in construction contracts. The statute in question reads as follows:

> A covenant, promise, agreement or understanding in or in connection with or collateral to a contract or agreement relative to a construction, alteration, repair or maintenance of a building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless a promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee, is against public policy and is void and unenforceable.

Tenn. Code Ann. § 62-6-123.

We do not believe, however, that in enacting this statute the legislature intended to repeal the risk-allocating provisions of the Uniform Commercial Code. In the two cases that have upheld the application of the statute, the facts have involved personal injuries and claims against a party involved in some aspect of a construction project. The negligent parties attempted to avoid liability by relying on an indemnity agreement with another party. In both cases, this court held that the statute rendered the indemnity agreement unenforceable. *See Carroum v. Dover Elevator Co.*, 806 S.W.2d 777 (Tenn. Ct. App. 1990); *Elliott Crane Service v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376 (Tenn. Ct. App. 1992).

-11-

The facts of these two cases fit the statute exactly. A negligent party involved in a construction contract cannot insulate itself by having an indemnity or hold harmless agreement with a third party. But the parties to a contract for the sale of goods are still free to allocate the risks between themselves under Tenn. Code Ann. § 47-2-719.

The courts have a duty to construe statutes so that they do not conflict. *Holder v. Judicial Selection Commission*, 937 S.W.2d 877 (Tenn. 1996). "[T]he Court should resolve any possible conflict between the statutes in favor of each other, whenever possible, so as to provide a harmonious operation of the laws." *State ex rel. Boone v. Sundquist*, 884 S.W.2d 438 at 444 (Tenn. 1994). Our construction of Tenn. Code Ann. § 62-6-123 avoids a conflict with Tenn. Code Ann. § 47-2-719.

## VII.
### THE SEPTEMBER 1999 TRIAL: TRINITY V. MCKINNON

The court in September of 1999 proceeded to trial on Trinity's claim for payment and McKinnon's affirmative defenses. As we have seen, the court rendered a judgment in favor of Trinity for the unpaid balance on its contract, plus pre-judgment interest and discretionary costs. For a host of reasons, both procedural and substantive, McKinnon appeals that judgment

### A. THE REFUSAL TO GRANT A CONTINUANCE

McKinnon argues that the trial court abused its discretion in refusing to continue the case again after making the judgments dismissing Tensor, Conwell, and TDOT final pursuant to Rule 54.02, Tenn. R. Civ. P.

This argument includes two separate propositions: (1) that proceeding to trial while the other appeals were pending is contrary to the purpose of Rule 54.02; and (2) that the same conditions making the prior continuance appropriate were still in effect. We think, however, that both propositions address themselves to the sound discretion of the trial judge, and that the trial judge's discretion should be respected "absent clear prejudicial error under the circumstances." *Turtle Creek Apts. v. Polk*, 958 S.W.2d 789 (Tenn. Ct. App. 1997).

With respect to Rule 54.02, McKinnon argues that the basic purpose of Rule 54.02 is to avoid the possible injustice of a delay in entering judgment on a distinctly separate claim until the whole case has been tried. *See* Wright and Miller, *Civil Procedure*, § 2654. In this case the whole case will have to be tried again if the court reverses the dismissal of McKinnon's counterclaim or the judgments in favor of the cross-defendants. We agree that by proceeding to trial while the other appeals were pending posed some risk to the trial court of a duplication of effort. But, the other side of that coin is a consideration by the trial judge of a multi-million dollar claim that is ready for trial on several of the basic issues, but lingers on her trial docket while memories fade and expenses mount. All of those considerations address themselves to the discretion of the trial judge and we cannot find that she abused her discretion in this case.

With respect to the argument that nothing had changed since the prior continuance, in addition to this being a shaky legal proposition, the fact is that circumstances had changed. The case was not ready for trial when the prior continuance was granted in July of 1998 because Tensor obtained an extension until September 15, 1998 to disclose its expert witnesses. The parties agreed in March of 1999 to set the case for September of that year, and by July, Tensor, Conwell and TDOT had all been granted summary judgment. So, the circumstances had changed, and the trial judge was well within her discretion in proceeding to trial.

## B. ACCEPTANCE OF THE STEEL

McKinnon argues that the trial court erred in finding that it had accepted the steel. "Acceptance" of goods under the Uniform Commercial Code is a term of art; it does not flow from the passage of title or possession. *See* J. White and R. Summers, *Uniform Commercial Code*, 8-2 at p. 429 (4th Ed. 1995). But since the consequences of acceptance are significant, if not deadly, *see* Tenn. Code Ann. § 47-2-607, the drafters of the Code took some pains to define how it occurs.

> (1) Acceptance of goods occurs when the buyer:
>
> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (b) fails to make an effective rejection (§ 47-2-602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
>
> (2) Acceptance of a part of any commercial unit is acceptance of that entire unit.

Tenn. Code Ann. § 47-2-606.

McKinnon asserts that what it ordered was not goods but a bridge, and a "bridge is not a bridge until it is completed." The contract, however, reveals that McKinnon ordered from Trinity the steel parts required to construct the bridge according to the design furnished by the State. Trinity agreed to furnish "Plate Girders; Stringer Beams; Lateral Bracing; Diaphragm Channels; Cross-Frames; Shop-Attached Shear Studs; High-Strength Bolts for Permanent Field Connections; Three Shop Coats of Paint; and Rail Freight to Yellow Creek Port on the Tennessee River near Iuka, Mississippi." These items were to be fabricated according to plans "issued by the Tennessee Department of Transportation." The individual pieces were fabricated according to shop drawings

-13-

prepared for Trinity by Tensor and submitted to and approved by the State. For some of the small members the drawings specified that they were to be partially assembled but shipped folded together as if to save room. We do not think one could argue that the individual pieces of steel were not goods under the statutory definition contained in Tenn. Code Ann. § 47-2-105(1): "all things . . . which are moveable at the time of identification to the contract."

Subsections 606(a) and (b) give the buyer a reasonable time to inspect the goods, a time period that varies with the type of goods involved. *Moses v. Newman*, 658 S.W.2d 119 (Tenn. Ct. App. 1983). Subsection 606(c) seems to draw a bright line, but even the simple test of "doing any act inconsistent with the seller's ownership" is subject to interpretation. Our courts have attempted to balance a reasonable time to inspect against use by the buyer holding that the statute gives the buyer a right to possession and some possible use of the goods without having accepted them. *Id.* at 121.

We have also held that acceptance does not occur when the buyer's inspection can only take place after the goods have been used or installed. *Henley Supply Co. v. Universal Constructors, Inc.*, No. 88-238-II, Nashville, April 7, 1989, 1989 WL 31620, at *8 (Tenn. Ct. App. 1989), but if the buyer does have a reasonable opportunity to inspect the goods acceptance occurs at the outside when the goods are used in the construction of a building. *Id.*, at *7.

McKinnon argues that the only time the steel could be inspected was when "the steel parts were actually joined together in the air over the river. We think, however, that the major defects McKinnon discovered in building the bridge could reasonably have been discovered before the bridge was constructed. McKinnon identified the following defects at the trial: kinks or doglegs in one of the girder segments; a lack of camber in one 150 foot girder segment; one lateral brace was too short; many bolt holes were too small; many bolt holes did not line up correctly; and one major steel member was too long to fit. With respect to the girder with kinks in it the tugboat captain pointed it out while the steel was being barged to the job site. The lack of camber in the other girder was noted while it was on the barge at the job site. Admittedly, it might not be practical to check all the bolt holes, but the record shows that Trinity sent workers to the site to ream out the holes that were too small and to redrill the holes that were in the wrong place. It turns out that with the exception of the short lateral brace, none of the steel was so defective that it had to be replaced. Therefore, we think it is inescapable that McKinnon accepted the steel. The buyer must pay at the contract rate for any goods accepted. *See* Tenn. Code Ann. § 47-2-607(1).

## C.

McKinnon asserts that the lower court's finding with respect to the cause of the collapse must be reversed because the "entire controversy doctrine" requires all comparative fault tortfeasors to be joined in the same action. *See Samuelson v. McMurtry*, 962 S.W.2d 473 (Tenn. 1998). Since Tensor, Conwell, and the State had been dismissed, McKinnon argues that the reason for the bridge's collapse could not be determined in a hearing involving only itself and Trinity.

-14-

We disagree. This action started as a simple contract claim by Trinity against McKinnon. McKinnon alleged as an affirmative defense that the defective steel furnished by Trinity caused the bridge to collapse. McKinnon also filed a counterclaim against Trinity for breach of contract and for negligently fabricating the steel, as well as third party actions against TDOT, E.L.Conwell & Co., and Tensor alleging that their negligence contributed to the problems with the steel. By the time of the trial in September of 1999, McKinnon's counterclaim and its third party claims had been dismissed, but the trial went forward on the original claim by Trinity and McKinnon's affirmative defenses.

As we have noted McKinnon does not have a negligence claim against Trinity. Therefore, as it stood on the eve of the trial, this was not a comparative fault case. Whatever application the "entire controversy doctrine" in *Samuelson v. McMurtry* has in a specific comparative fault setting, it does not apply here.

### D. WHAT CAUSED THE BRIDGE TO COLLAPSE
### 1.

McKinnon argues that the issue of the bridge's collapse was not triable and was not actually tried in the court below. With the trial set for September 13, 1999 and the third parties to whom McKinnon sought to assign the fault for the collapse of the bridge now dismissed, McKinnon filed a motion in limine to exclude any proof at the trial regarding the cause of the collapse. On the first day of trial the court said in refusing to grant the motion in limine:

> As I reflect on what I know thus far, the collapse may be material to the issue of whether or not there was proper revocation of the acceptance. If what has been suggested to me in the pretrial conference was that acceptance was not complete until all of the pieces of the puzzle had been assembled, that the bridge was up, and that would demonstrate acceptance, the collapse of the bridge prior to that, quote, total acceptance, would be a defense that McKinnon might be entitled to raise as to whether or not the bridge was properly fabricated.

> And I still am taking the position that I have consistently throughout, that the issue of the collapse of the bridge is relevant and material to this contract dispute, and respectfully decline to exclude evidence of the cause of the Highway 69 bridge collapse.

Trinity did not put on any proof of causation in its case in chief. McKinnon did not offer any expert proof about causation as a defense, but the court allowed Trinity to cross-examine McKinnon's fact witnesses on the causation issue. When McKinnon continued to object the court overruled the objection with the following comment:

I understand the objection, and I am going to overrule it. There is the primary issue of whether or not the fabrication met the specifications, and that was the thrust of the examination-in-chief with regards to this witness.

The subissues are having to do with substantial compliance or specific compliance. A second issue would be whether the material was accepted. And the third issue is whether or not, if accepted, there was proper revocation.

Now, I can't control the way that the proof is going to come in or what it's going to show, but Mr. Howser has submitted – and I've already determined that if he is inclined to put on proof as to how the bridge collapsed, I'm going to take that into the entire factual determination that I have to make in order to judge those three issues. So I respectfully overrule your motion.

MR. SMITH: May I – may I be allowed to make one further comment?

THE COURT: I usually don't let anybody make a comment after I've ruled. Are you going to critique it?

MR. SMITH: No, I'm not questioning it. No, I'm not questioning the ruling. I want to make something clear that Your Honor hit.
. . .

THE COURT: I'm not going to revisit this ruling, but I will note that in the pretrial brief of McKinnon, the issues that were presented to the Court was that Trinity – the steel furnished by Trinity did not conform to the contract documents; two, that McKinnon could not and did not accept the steel; and three, if McKinnon is found to have accepted nonconforming steel, McKinnon properly revoked that acceptance. And it is on that basis that this Court has made its rulings, and we'll go forward.

When McKinnon closed its proof without offering any evidence as to causation Trinity moved for a "directed verdict" under Rule 50, Tenn. R. Civ. P. The substance of the motion was that McKinnon had accepted the steel, and because the condition of the steel had substantially changed (because of the collapse), McKinnon could not revoke its acceptance. *See* Tenn. Code Ann. § 47-2-608(2). Therefore, Tenn. Code Ann. § 47-2-607(1) obligated McKinnon to pay for the steel. The trial judge treated the motion as one for an involuntary dismissal under Rule 41, Tenn. R. Civ. P., the dismissal, obviously, relating to McKinnon's revocation defense. The court said:

I decline to render a judgment at this time for the sole purpose of Trinity demonstrating to me that the substantial change in the condition of the goods was not caused by their own defects, and that is the failure of the bridge.

Trinity then argued that McKinnon had the burden of proof on its affirmative defense and if they were waiving their defense the revocation issue should be decided in Trinity's favor. McKinnon disavowed the waiver of any of its defenses and the trial judge said:

> There is an objection to the testimony of this witness to the extent that it relates to the cause of the collapse of the bridge as being immaterial or irrelevant.

> My understanding of the UCC states that "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for revocation and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

> I believe that throughout this lawsuit, I have tried to make myself very clear as to the status of this lawsuit, and Mr. Howser seems to understand and Mr. Smith does not seem to understand, and I think that has been a concern of mine that the legal theories and principles upon which I have made my rulings do not seem to be understood.

> Mr. Howser, what you said is totally appropriate. I do believe that it is very relevant and material as to what caused the substantial change in the condition of the goods. I have said that from almost the inception of my understanding of this case several years ago, and I intend to proceed in that light.

Trinity then proceeded to offer the testimony of Dr. Howard Hill who gave his opinion that the bridge collapsed, not because of any fabrication defects in the steel, but because a cross brace had been removed by the erection contractor.

Based on these facts, we conclude that what caused the bridge to collapse was triable and was actually tried in the September 1999 trial.

**2.**

McKinnon also argues that the properly introduced evidence at the trial does not support the trial judge's finding that the bridge collapsed because the cross brace had been removed. This argument requires us to conclude that Dr. Hill's testimony was not "properly introduced," because, otherwise, the evidence preponderates in favor of the finding. *See* Rule 13(d), Tenn. R. App. P. McKinnon repeats its argument that the collapse of the bridge was not relevant to anything and the testimony about the cause was not "proper" since it was introduced on rebuttal and over the contention by both McKinnon and Trinity that proof of causation was not necessary.

Of course, this argument overlooks Trinity's reason for its argument, but the fact remains that the cause of the collapse was relevant to McKinnon's revocation of acceptance defense. Although

McKinnon steadfastly disclaims that its ability to revoke its acceptance depends on the cause of the collapse, we can see no other evidence of a revocation of acceptance prior to the collapse. *See* Tenn. Code Ann. § 47-2-608(2). Therefore, the only hope McKinnon had to sustain its revocation defense was a finding that the defects in the steel caused the bridge to collapse. Only by establishing the fact that the defects in the steel caused the substantial change in condition could McKinnon sustain its right to revoke its acceptance. The trial judge had announced that requirement months in advance of the trial, again in ruling in McKinnon's motion in limine, and at several places in the lengthy trial itself. We think Dr. Hill's evidence was proper and sustains the trial judge's finding on why the bridge collapsed.

### 3.

In its third party complaint against ABC McKinnon alleged that ABC caused the bridge to collapse. Trinity introduced the ABC complaint at the trial below. McKinnon alleges that in allowing the complaint to be introduced the chancellor committed reversible error.

McKinnon bases its argument on an unreported case from this court holding that the modern trend is to disallow the introduction of pleadings containing claims of comparative fault against defendants who have been dismissed or who have settled. *See Patterson v. Dunn*, No. 02A01-9710-CV-00256, Jackson, June 6, 1999, 1999 WL 398083 (Tenn. Ct. App. 1999).

We think, however, that the error was harmless. *See* Rule 36(b), Tenn. R. App. P. This was not a jury trial. The factual allegations against ABC were already known by the chancellor. Reminding the chancellor of those allegations, in our opinion, did not affect the outcome of the trial below.

### VIII.
#### DISCRETIONARY COSTS

The trial court awarded Trinity $55,907.11 in discretionary costs. Rule 54.04(2) of the Tennessee Rules of Civil Procedure provides in pertinent part:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment. The trial court retains jurisdiction over a motion for discretionary costs even though a party has filed a notice of appeal. The court may tax discretionary costs at the time of voluntary dismissal.

The rule specifies that the costs are allowed "in the court's discretion," and the appellate courts have refused to alter a trial court's ruling absent a clear abuse of discretion. *Mix v. Miller*, 27 S.W.3d 508 (Tenn. Ct. App. 1999); *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56 (Tenn. 1992). An abuse of discretion has been found where the losing party was not allowed to present a defense to the motion for discretionary costs, *Oster Div. of Sunbeam Corp. v. Yates*, 845 S.W.2d 215 (Tenn. 1992), where expert witnesses were not "necessary" expert witnesses, *Duncan v. DeMoss*, 880 S.W.2d 388 (Tenn. Ct. App. 1994), and where the request for discretionary costs was not supported by an affidavit or otherwise. *DePriest v. 1717-19 West End Associates*, 951 S.W.2d 769 (Tenn. Ct. App. 1997).

McKinnon argues that some of the expert witness fees awarded were not "necessary" costs because the witnesses were also employed for testimony in another action that arose out of the collapse of the bridge. But the record reflects that the chancellor adjusted the award of discretionary costs to take that action into account.

McKinnon also asserts that the chancellor should not have awarded Trinity its costs in deposing McKinnon's experts who had opinions about the defects in the steel. This objection is based in part on McKinnon's position that as the case went to trial the reason for the bridge's collapse was no longer relevant and in part on the fact that McKinnon is the prevailing party on the question of the defects in the steel. As to the first point, we have already ruled that the reason the bridge collapsed was triable and was in fact tried. As to the prevailing party argument, the chancellor did find that the steel was nonconforming in many respects, but McKinnon accepted it and was obligated to pay for it.

Both sides blame the other for making the trial longer than necessary, thus inflating the court reporter fees and the fees for experts who attended the trial. The trial judge is in the best position to assess the blame for dilatory tactics, and when this argument was addressed to her, the chancellor failed to penalize either party.

We conclude that the chancellor did not abuse her discretion in awarding Trinity discretionary costs.

## IX.
### TRINITY'S ATTORNEYS' FEES UNDER TENN. CODE ANN. § 66-34-101

Trinity sought to recover its attorney's fees under the "Prompt Pay Act of 1991", Tenn. Code Ann. § 66-34-101, et seq. In addition to providing what we thought was already obvious – that certain contractors were entitled to be paid when they had performed their contracts – the Act allows a contractor to seek equitable relief if the obligor does not pay within ten days after receiving notice that payment is due. Tenn Code Ann. § 66-34-602(3). The prevailing party in that action may recover its reasonable attorney's fees if the nonprevailing party has acted in bad faith. Tenn. Code Ann. § 66-34-602(4)(b).

The chancellor denied Trinity's request for attorney's fees, finding that McKinnon had not acted in bad faith. Trinity asserts that the evidence preponderates against that finding. *See* Tenn. R. App. P. 13(d).

The Act does not define bad faith. There are, however, cases defining bad faith in other areas of the law. *See Glazer v. First American Nat'l Bank*, 930 S.W.2d 546 (Tenn. 1996); *State v. Golden*, 941 S.W.2d 905 (Tenn. Cr. App. 1996). There are more cases interpreting what amounts to good faith under the Uniform Commercial Code's definition as "honesty in fact in the conduct or transaction concerned." Tenn. Code Ann. § 47-1-201(19). *Bank of Crockett v. Cullipher*, 752 S.W.2d 84 (Tenn. Ct. App. 1988); *Huntington Nat'l Bank v. Hooker*, 840 S.W.2d 916 (Tenn. Ct. App. 1991); *Locke v. Woods*, 25 Bankr. 924 (Bank. E.D. Tenn. 1982).

In *Glazer* the Court explored the various meanings of honesty and concluded that bad faith should be construed as "actions in knowing or reckless disregard of . . . contractual rights." 930 S.W.2d at 549. We would add that the definition should include rights or duties under the contract. In *Huntington Nat'l Bank*, we said that good faith imposes an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of the law. 840 S.W.2d at 926 (citing *Lane v. John Deere Co.*, 767 S.W.2d 138 (Tenn. 1989)).

In reviewing this record we have no doubt that McKinnon's principals honestly believed that their company did not owe the money claimed by Trinity. In resisting the claim they were not using the technicalities of the law to take unconscientious advantage of Trinity. Therefore, we conclude that the chancellor made the correct decision on the Prompt Pay Act.

## X.
### THE COMPLAINT AGAINST TENSOR

McKinnon sued Tensor Engineering Company for its negligence in preparing the shop drawings for Trinity and as a third party beneficiary of a contract for the preparation of the shop drawings. The chancellor granted Tensor's motion for summary judgment on the following grounds:

A. That no material issue of fact is in dispute and that as a matter of law, McKinnon Bridge Co., Inc. may not bring an action directly against [Tensor] for negligence or breach of Third Party Beneficiary Contract in the absence of privity of contract between the parties based upon the record presented to the Court; and

B. That McKinnon Bridge Company, Inc. may not prevail upon its claim of "negligent misrepresentation" pursuant to *John Martin Co. v. Morse/Diesel, Inc.,* 819 S.W.2d 428 (Tenn. 1991) because the record before the court, including the pleadings, affidavits, depositions, and undisputed statement of fact filed by the parties fails to establish any disputed, material fact on the issue of "negligent misrepresentation." *See, Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128 (Tenn. 1995).

On McKinnon's motion to reconsider the chancellor held:

> By way of explanation, the Court finds that its previous ruling granting the motion for summary judgment filed by third party defendant Tensor was correct whether the original third party complaint is interpreted to include an allegation of negligent misrepresentation or whether McKinnon relies upon its newly filed allegations of negligent misrepresentation. The Court is of the opinion that the decisions of *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 133 (Tenn. 1995), *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn. 1991), and *McCrary v. Kelly Technical Coatings, Inc.,* 1985 WL 75663 (Tenn. App. 1985), compel the re-affirmation of this Court's ruling that based upon the pleadings, affidavits, depositions and undisputed facts filed by the parties fails to establish any disputed material fact on the issue of "negligent misrepresentation" or the Economic Loss Rule.

McKinnon has not appealed the chancellor's action in dismissing the third party beneficiary claim. Therefore we will address only the negligence/negligent misrepresentation claim.

Much of the argument in the trial court and in this court has been focused on the assertion that McKinnon could not recover economic losses absent privity with Tensor. We think that argument is erroneous and the chancellor erred in sustaining it.

McKinnon's relationship to Tensor is not one of a buyer and seller of goods. Therefore, their relationship is fundamentally different from McKinnon's relationship to Trinity where the law has said that recoveries for purely economic losses are better addressed under contract rather than negligence. It may be true that the economic harm rule would still defeat McKinnon's claim for "indirect" economic losses. *See United Textile Workers v. Lear Siegler*, 825 S.W.2d 83 (Tenn. Ct. App. 1990); *Local Joint Executive Bd. of Las Vegas v. Stern*, 651 P.2d 637 (Nev. 1982). But the losses McKinnon alleges are far more direct than the lost wages suffered by the employees of the industrial park shut down by the defendant's negligence in *Lear Siegler*.

This case is governed by the Supreme Court's decision in *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn. 1991). The main part of that opinion starts out with a critical observation: "This is not a products liability case." 819 S.W.2d at 431. The court goes on to hold that in a case of negligent supervision or negligent misrepresentation privity was not a required element of a claim for purely economic losses. *Id.* at 435. In adopting Section 552 of the *Restatement (Second) of Torts*, the Court explained the consequences of its decision in this way:

> By the use of this standard, liability in tort would result when, despite lack of contractual privity between the plaintiff and the defendant,

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*

(2) the defendant supplies faulty information meant to guide others in their business transaction; *and*

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*

(4) the plaintiff justifiably relies upon the information.

*Id.* at 431.

We are hampered in our review of this issue because of the way it was presented to the trial court. McKinnon's original complaint against Tensor did not allege a cause of action based on negligent misrepresentation. In its response to Tensor's motion for summary judgment, however, McKinnon argued that it had a cause of action based on negligent misrepresentation, and the chancellor's order dismissing the case addressed McKinnon's arguments. Apparently McKinnon moved to amend its complaint against Tensor to include the necessary allegations but the amended complaint is not in the record. Nevertheless, negligent misrepresentation is the only negligence cause of action briefed by McKinnon on appeal.

It appears to us that, despite the absence of pleadings, the negligent misrepresentation claim was actually addressed in the trial court. *See* Rule 15.02, Tenn. R. Civ. P. Therefore it may be reviewed here, and on the merits of the claim, we are of the opinion that the chancellor erred in granting summary judgment to Tensor. We cannot say that the undisputed facts show (1) that Tensor did not supply faulty shop drawings knowing that they would be used by McKinnon in the erection of the bridge, or (2) that Tensor exercised reasonable care in preparing the drawings, or (3) that McKinnon did not justifiably rely on the shop drawings or did not suffer any damages from its reliance.

Whether Tensor knew or should have known that its drawings would be used by McKinnon is a question of fact and requires an interpretation of the various contracts, most of which incorporate by reference other contracts or the TDOT standards. At this point we do not know if the drawings were incorrect, nor do we know what part, if any, they played in the actual work of erecting the bridge. Therefore Tensor was not entitled to summary judgment on the negligent misrepresentation claim.

## XI.
### MCKINNON'S COMPLAINT AGAINST CONWELL AND TDOT

McKinnon's third party claim against Conwell and vicariously against TDOT is also based on Conwell's breach of its contact with TDOT, of which McKinnon claims to be a third party beneficiary,[2] and Conwell's negligent misrepresentations. In the trial court, after the chancellor granted Tensor's motion for summary judgment, Conwell filed its own motion, supported by a statement of undisputed facts and the affidavit of Mr. McKinnon.

Under the prime contract between McKinnon and TDOT, TDOT reserved to itself the right to have an independent inspector go to the site of the steel fabrication and inspect the steel as it was being fabricated. TDOT contracted with Conwell for these services. The contract between TDOT and Conwell – stripped of its boilerplate provisions – provided for a certified welding inspector, to be paid $19.95 per hour, who would, for a total price not to exceed $25,935.00, confirm that the fabrication procedures met state standards. Conwell's representative furnished the inspection reports to the state and stamped the steel as it left the fabrication plant.

McKinnon did plead a cause of action against Conwell for negligent misrepresentations. In a complaint filed on November 12, 1996 these allegations appear:

25. Conwell misrepresented material facts concerning the fabrication of the structural steel. Such misrepresentations included but are not limited to the following:

1. Mislocation of the lateral stiffener(s);
2. Improper changes and alterations from design drawings;
3. Improper variations in horizontal stiffeners;
4. Improper variations in bearing stiffeners; and
5. The failure to correct or inspect shop errors.

26. The tortious negligent misrepresentations were made by Conwell, in the course of Conwell's business, profession and employment.

27. The misrepresentations were made during the transaction in which Conwell has a pecuniary interest.

28. The false information or omitted information supplied by Conwell to TDOT was relied upon by McKinnon during the construction process of the bridge and/or Project.

---

[2]The trial court dismissed the third party beneficiary claim on June 7, 1996 at about the same time it allowed McKinnon to amend its complaint to state a claim of negligent misrepresentation. McKinnon did not appeal the dismissal of the third party beneficiary claim.

29. As a result of the negligent misrepresentations of Conwell, McKinnon has suffered a pecuniary loss and physical harm caused by McKinnon's justifiable reliance upon the information supplied by Conwell to TDOT.

30. Conwell failed to exercise reasonable care or competence in performing shop inspectional services.

31. Conwell knew that the shop inspectional services it provided to TDOT were being relied upon by McKinnon.

32. Conwell knew or should have known that McKinnon intended to rely upon the fabricated steel to construct the bridge for the project.

The allegations were substantially repeated in later pleadings. Although the parties extensively briefed and argued the question, McKinnon essentially conceded that the result should be the same as the result reached in Tensor's motion. So, without waiving its right to appeal, McKinnon acquiesced in the entry of the order granting Conwell summary judgment.

We are of the opinion that for the same reasons we reversed the summary judgment in favor of Tensor, the judgment in favor of Conwell/TDOT must also be reversed. The economic harm rule does not bar McKinnon's claim for negligent misrepresentations against Conwell, and the record does not conclusively show that McKinnon cannot prove the necessary elements of a negligent misrepresentation cause of action. Although the necessary finding that Conwell's work would be or was relied on by McKinnon seems remote, the record does not conclusively negate that finding. We, therefore, reverse the summary judgment rendered in favor of Conwell/TDOT.

## XII.
### COLLATERAL ESTOPPEL

Our decision with respect to Tensor and Conwell/TDOT requires us to address the question of whether McKinnon's claim against them for the collapse of the bridge is barred by collateral estoppel. We conclude that the issues actually decided in the trial below are not dispositive of McKinnon's third party claim.

Collateral estoppel, an issue preclusion doctrine, was devised by the courts to "conserve judicial resources, to relieve litigants from the cost and vexation of multiple lawsuits, and to encourage reliance on judicial decisions by preventing inconsistent decisions." *Beaty v. McGraw*, 15 S.W.3d 819 at 824 (Tenn. Ct. App. 1998). The doctrine bars the parties or their privies from relitigating issues that were actually raised and determined in an earlier suit. *Id.*

Collateral estoppel may be used by a defendant in the second suit (defensive collateral estoppel), or it may be used by a plaintiff in a second suit (offensive collateral estoppel). In Tennessee the offensive use of collateral estoppel requires that the parties be identical in both

-24-

actions. *Beaty v. McGraw*, 15 S.W.3d 819 (Tenn. Ct. App. 1998); *Algood v. Nashville Machine Co.*, 648 S.W.2d 260 (Tenn. Ct. App. 1983). Without saying so specifically, however, Tennessee has not required party mutuality in applying defensive collateral estoppel. In *Phillips v. General Motors*, 669 S.W.2d 665 (Tenn. Ct. App. 1984), the court said that different parties are in privity if they stand in the same relationship to the subject matter of the litigation. *Id.* at 669. *See also Shelley v. Gipson*, 400 S.W.2d 709 (Tenn. 1966). Thus, a plaintiff who sued an automobile dealer for a defective car and lost could not then sue the manufacturer on an identical claim. *Cantrell v. Burnett & Henderson Co.*, 216 S.W.2d 307 (Tenn. Ct. App. 1948). The judgment in the first case that the car was not defective precluded the plaintiff from asserting that the car was defective in an action against the manufacturer.

Even if the parties do not have to be identical for the application of defensive collateral estoppel, the issue sought to be precluded must be identical in both cases. *Beaty v. McGraw*, 15 S.W.2d 819 (Tenn. Ct. App. 1998); *Tennessee Farmers Mut. Ins. Co. v. Moore*, 958 S.W.2d 759 (Tenn. Ct. App. 1997); *Scales v. Scales*, 564 S.W.2d 667 (Tenn. Ct. App. 1977). In McKinnon's counterclaim against Trinity the court decided that the sole cause of the collapse was the removal of a lateral brace during the erection process. That decision conclusively ruled out the defective steel as a cause, but it does not decide what part, if any, the negligently-supplied information from Tensor or Conwell played in the removal of the brace. Since the parties did not narrow their focus to that point in the trial court, we would have to say that the facts are still in dispute on that issue.

We reverse the judgments in favor of Tensor and Conwell/TDOT. In all other respects the judgments of the court below are affirmed and the cause is remanded to the Chancery Court of Davidson County. Tax the costs on appeal equally to McKinnon, Tensor, and Conwell.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.