# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 21, 2016 Session

## CLASSIC CITY MECHANICAL, INC. v. POTTER SOUTH EAST, LLC, ET AL.

### Appeal from the Chancery Court for Knox County
### No. 1855881 John F. Weaver, Chancellor
_____

### No. E2015-01890-COA-R3-CV-FILED-OCTOBER 14, 2016
_____

This case involves competing claims concerning a State construction project. The trial court awarded one of the subcontractors on the project compensatory damages, plus interest, based on the prime contractor's failure to remit payments for work that had been performed. On appeal, the prime contractor challenges the trial court's finding that it committed the first material breach of its contract with the subcontractor. The prime contractor also challenges the trial court's finding that it did not prove its claims for damages, which were predicated on an alleged delay created by the subcontractor and the subcontractor's cessation of performance. Although the subcontractor maintains that the trial court's findings regarding material breach should be left undisturbed, it appeals the trial court's specific award of interest, the dismissal of its fraudulent concealment claim, and the denial of its request for attorney's fees. Having reviewed the record transmitted to us on appeal, we affirm in part, modify in part, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Modified in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Stephen A. Marcum, Huntsville, Tennessee, for the appellants, Potter South East, LLC and Western Surety Co.

Robert P. Noell and William F. Clayton, Knoxville, Tennessee, for the appellees, Classic City Mechanical, Inc. and The Guarantee Company of North America, USA.

Melissa Brodhag, Nashville, Tennessee, for the appellee, John Schroer, Commissioner of The Tennessee Department of Transportation.[1]

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

This appeal stems from a Tennessee Department of Transportation ("TDOT") construction project that involved, among other things, the building of a bridge and extension of a road in Knox County. By contract dated March 26, 2012, TDOT entered into an agreement with Appellant Potter South East, LLC ("Potter"), under which Potter would serve as prime contractor for the project. In conjunction with this contract, Appellant Western Surety Company ("Western Surety") executed a payment and performance bond for the full amount of Potter's contract with TDOT. At the time of the contract's execution, the unit prices in the contract totaled $15,660,653.11. Although the contract between Potter and TDOT did not have a master schedule, the original completion deadline was listed as August 31, 2014. However, pursuant to a change order that was entered after work on the project had begun, the completion date was later changed to "on or before December 13, 2014."

On March 28, 2012,[2] Potter entered into a subcontract with Classic City Mechanical, Inc. ("Classic City") for the installation of natural gas lines related to the TDOT project. The unit prices of the subcontract totaled $1,051,656.50, and the subcontract incorporated by reference the terms and conditions of the prime contract between Potter and TDOT. Although the subcontract obligated Classic City to "commence work promptly or upon notice from [Potter]," the subcontract otherwise listed no date for the commencement of Classic City's performance. The subcontract was also devoid of any specific deadlines or milestones that Classic City was contractually obligated to meet with respect to its project obligations. As with the prime contract, no master schedule was provided relative to the project. Subsequent to the signing of the subcontract, Appellee Guarantee Company of North America USA ("Guarantee Company") executed documents binding itself as a surety for Classic City's obligations to Potter.

One of Classic City's obligations under the subcontract was to install a sixteen inch gas line in the area of Beaver Creek; the Knoxville Utilities Board ("KUB") served as an

---

[1] Commissioner John Schroer did not file a brief.

[2] Although the subcontract is dated March 28, 2012, it appears that it was actually signed the next day on March 29, 2012.

inspector over this work. On May 1, 2012, Potter emailed Trent Gibson ("Mr. Gibson"), one of Classic City's owners and chief financial officer, to inform him that Classic City needed to start installing the sixteen inch line on June 18, 2012. A subsequent email was sent to Mr. Gibson on June 6, 2012, reminding him that Classic City was scheduled to start work. Mr. Gibson responded to the June 6 email by noting that Classic City was "a couple of weeks behind" with its steel crew. He represented that Classic City was still working with KUB to get its welders tested and stated that Classic City was also still waiting to receive its material submittals. It is undisputed that when Classic City had signed the subcontract with Potter earlier that spring, it did not have any KUB-certified welders on its payroll.

Over the next several months, a flurry of correspondence ensued regarding Classic City's progress on the sixteen inch line. In an August 30, 2012 email, Potter manager Dwayne Potter ("Mr. Potter") sent an email to Mr. Gibson accusing Classic City of causing delay to the overall TDOT project.

In pertinent part, the email stated as follows:

> The proposed 16'' steel gas line in the area of Beaver Creek has and continues to disrupt the master schedule of the project. . . . Potter South East is requesting your personnel to begin immediately on a six day work week, sixteen hours a day (KUB specifications governing) until work is completed on the 16'' steel gas line. If this work is not completed on or before September 17th, 2012 liquidated damages in the amount of $5,350.00 per day as outlined in the sub-contract will be accessed [sic] to Classic City Mechanical Inc. to cover delays impacting the project in and around the 16'' steel gas line.
>
> At this time, please present Potter South East a plan of operation for the installation of the 16'' steel gas line.

Mr. Gibson responded to Mr. Potter's email by noting that the project had not yet been cleared to start by KUB. In relevant part, his email stated as follows:

> The project started off late in the first place due to submittal delays from TDOT and KUB. Our submittals sat on people's desks for 60 days or more, and then had to be resubmitted. . . . I can't control either of these entities. Due to those delays, one of our 2 welders quit and we are in the process of testing another one tomorrow. We are required to have 2 welders on 16'' and no welder is going to sit and wait on KUB. He left and we hired another one as soon as we knew.

- 3 -

There is absolutely no way that the steel can be done by Sept. 17th. We can only begin when KUB gives us clearance to, and when the new welder passes (hopefully we'll know on Tuesday). When that happens we will work as long and hard to complete the work in a timely manner.

On September 25, 2012, Mr. Potter emailed Mr. Gibson to let him know that no Classic City personnel were on the work site. Mr. Potter stated that this was "totally unacceptable" and once again accused Classic City of "holding up the progress on the entire project." Mr. Potter indicated that if work was not started within five days, Potter would "have no other option but to seek legal action." Mr. Gibson responded to Mr. Potter's September 25 email by noting that Classic City was still having difficulty in securing clearance from KUB.

On September 28, 2012, John Strunk ("Mr. Strunk"), an engineer and "estimator" with Potter, emailed Mr. Gibson to let him know that if Classic City did not commence work the following Monday, Potter would request that a conference call take place between Mr. Gibson, a representative of KUB, and Potter. In response to Mr. Strunk's email, Mr. Gibson stated that Classic City still had welder issues, but nonetheless indicated that it would be on site to begin work the following Monday. Subsequent emails where exchanged concerning Classic City's progress, and on November 2, 2012, Mr. Strunk emailed Mr. Gibson to express Potter's dissatisfaction with the work. In relevant part, the email read as follows:

There are continued delays that are being created due to the lack of progress on your line and bore installs. These delays directly affect the master schedule of the project, especially grading operations. The gas line installation needs to be brought back to maximum production immediately.

At this time, Potter South East is requesting a work schedule (plan of operation) from Classic City Mechanical for this project beginning next week, with every effort to get back on track as soon as possible.

The following Wednesday, Mr. Gibson emailed Mr. Strunk a proposed schedule that outlined Classic City's itinerary through the beginning of December 2012. An updated schedule was later provided on November 20, 2012. On December 2, 2012, Mr. Gibson emailed Mr. Strunk again to inform him that Classic City was still having some issues with securing welders. In part, the email stated as follows: "We have been spinning our wheels and it's time for us to regroup our steel crew. I'm completely disappointed in their performance and changes are coming immediately on the steel crew." A few days later, on December 6, 2012, Mr. Gibson emailed Mr. Strunk to inform him that Classic City had retained qualified welders and that it would resume steel work the following Monday.

On January 27, 2013, Mr. Gibson emailed Mr. Strunk again, this time to let him know that Classic City's work had been delayed due to rainstorms:

> As for the steel portion, we have been under water for 2 weeks and I had to shut the job down till better weather and lower flood levels. I've been paying welders to sit on standby but we will have to reevaluate this practice since we can't even do the tie-ins until warmer weather. We need 2 weeks to complete the job (not including tie-ins which may take 3 days) if its [sic] not underwater and we have 10 full work days.

Following this email, on January 29, 2013, Mr. Potter wrote an email to Mr. Gibson stating that Classic City's performance on the gas line installation had been "unacceptable." He threatened to remove Classic City from the project if work did not begin immediately and progress on a daily basis. On January 31, 2013, Mr. Gibson emailed Mr. Potter and reiterated his position that Classic City's work on the sixteen inch line had been delayed by weather. He also noted, however, that he had informed his bonding company that Classic City was "to blame for the steel portion starting late and during the wet season."

By letter dated February 11, 2013, Potter's counsel wrote Mr. Gibson informing him that Classic City was in breach of the parties' subcontract. The letter stated that Potter was entitled to liquidated damages due to Classic City's delay in performance. However, the letter indicated that Potter would consider waiving the liquidated damages purportedly owed to it if Classic City fully completed its obligations within forty-five days.

On February 19, 2013, Mr. Gibson sent an email to Mr. Strunk outlining Classic City's plan of action over the next thirty days. In addition, Mr. Gibson's February 19 email informed Mr. Strunk that Classic City had not received payment for any work installed to date. In pertinent part, the emailed stated as follows: "Pipe has been installed along Brickyard Rd. and on the 16'' steel, and paysheets were turned in from October until December 20th. Please advise on when we can expect payment[.]" In subsequent emails sent by Mr. Gibson to Potter in March and April 2013, Classic City continued to inquire why it had not received payment for the work it had performed. In an email dated April 12, 2013, Potter informed Mr. Gibson that discussions with Potter's legal counsel were scheduled for April 17 concerning the issue of liquidated damages. The email indicated that "[a]t that point payments will be distributed according to council's [sic] direction."

Although the correspondence between Classic City and Potter focused in large part on Classic City's progress in installing the sixteen inch gas line near Beaver Creek, Classic City's work included other tasks as well. Among other things, Classic City also installed eight inch plastic pipe. Over the course of its time on the project, Classic City performed

- 5 -

more than $500,000.00 worth of work pursuant to the subcontract. Payment for its performance, however, was not readily forthcoming. Because the subcontract between Potter and Classic City incorporated the terms and conditions contained in the prime contract between TDOT and Potter, Classic City's right to payments from Potter was governed by the following provision:

> The prime contractor must pay each subcontractor for work performed under its subcontract no later than 30 days from the date the prime contractor receives payment for the work from the Department. The prime contractor must pay each material supplier for materials supplied to the project no later than 30 days from the date the prime contractor receives payment for the material from the Department. . . . The prime contractor shall provide monthly payment certification to the Department entitled "Prompt Payment Certification Form". An officer of the prime contractor shall sign the "Prompt Payment Certification Form". The Department will withhold estimate payments if information is not submitted. The Department will withhold estimate payments for subcontracted items if subcontractors, at any tier, or materials suppliers are not paid. Also, all required certifications must be in the field office and accepted before such work is deemed satisfactorily completed. Any delay or postponement of payment from the above referenced time frame will result in accrual of interest as provided under TCA, Section 12-4-707(b).

In addition to the above provision, the subcontract specifically provided as follows: "[Potter] agrees to pay [Classic City] the stated consideration for said work on the basis of the quantities allowed and paid for by [TDOT], less the same percentage retained by [TDOT], which percentage may be retained until completion of the Original Contract and final payment by [TDOT.]"

Although TDOT generated multiple pay estimates and paid Potter for work completed on the project, including work that had been performed by Classic City, Potter did not remit any of the corresponding payments to Classic City, save for one payment totaling over $42,000.00 in March 2013.[3] In a number of prompt pay certifications that Potter submitted to TDOT in the spring of 2013, Potter represented that it did not pay Classic City because the parties were "Under Litigation." At the time that these representations were made, they were factually inaccurate. Litigation would not ensue between Potter and Classic City until July

---

[3] The March 2013 payment to Classic City was for work performed between October 21, 2012 and November 20, 2012. As TDOT paid Potter for this work in December 2012, it is clear that Potter did not pay Classic City within thirty days of receiving payment from TDOT.

2013. When TDOT later learned that Potter was withholding payment from Classic City, it deducted the corresponding amounts "back off" of its contract with Potter.

By letter dated May 1, 2013, Potter's counsel sent Mr. Gibson notice alleging that Classic City remained in default. The letter stated that Potter was entitled to liquidated damages in the amount of $5,350.00 per day, effective as of February 12, 2013, and warned Classic City that Potter retained the right to exercise "any and all" of the other remedies provided for in the subcontract. Two weeks later, on May 14, 2013, Classic City's counsel sent a letter to Potter's counsel, as well as Potter's surety, Western Surety, informing them that the failure to pay Classic City for the work it had performed was a willful violation of the Prompt Pay Act of 1991. *See* Tenn. Code Ann. § 66-34-101, *et seq.* The May 14 letter, which was also sent to TDOT via certified mail, further indicated that Classic City would cease working on the project if appropriate payment was not forwarded to it. In relevant part, the letter stated as follows on this issue:

> The failure to pay Classic City for the work it performed [the] last seven months constitutes a material breach of the subcontract. If this breach is not cured within ten days, Classic City will be forced to stop work on the Project until full payment is received. In such event, the time in which Classic City's work shall be performed shall be extended appropriately and the Subcontract sum shall be increased by the amount of the Subcontractor's reasonable costs of shut-down, delay and start-up, plus interest.

In concluding the letter, Classic City's counsel challenged Potter's right to rely on the liquidated damages provision. In addition to asserting that the subcontract's liquidated damages provision was, in effect, a penalty provision, Classic City's counsel asserted that there was no clear proof that the TDOT project had been delayed. When no additional payment was forthcoming in the ensuing weeks, Classic City's counsel sent Potter and Western Surety a letter indicating that Classic City was terminating the subcontract due to nonpayment.

At the time that Classic City stopped working on the project, it had not completed all of the tasks assigned to it under the subcontract. To finish the work, Potter entered into a subcontract with Southeast Connections ("SEC"), albeit at higher rates than it had agreed to with Classic City. SEC would eventually complete the tie-in of the sixteen inch line with the KUB system in May 2014.

A few months after SEC had taken over the work for Classic City, an issue arose with the payment of subcontract item #771M04.06. Although TDOT had previously paid Potter for Classic City's performance on this item, which involved the installation of a sixteen inch

carrier pipe enclosed in casing, the work was subsequently found to be deficient in November 2013. When it was determined that Classic City had not installed item #771M04.06 pursuant to the required method, TDOT and Potter compromised the amount payable to Potter for the work. Of the $110,432.94 sum compromised between TDOT and Potter for the work performed on item #771M04.06, Classic City would eventually assert a claim for slightly over $75,000.00.

As previously noted, the original completion date for the TDOT project was listed as August 31, 2014. However, as the result of the entry of a change order in November 2013, the completion date was extended by 104 calendar days to December 13, 2014. Potter sought this extension of time due to delays associated with the relocation of certain electrical lines.[4] In pertinent part, its letter to TDOT requesting an extension of time stated as follows:

> This change first came to the attention of our electrical sub-contractor's material supplier on May 1, 2012 after the initial material order had been placed. Plan revisions were submitted from Cannon & Cannon Engineering on behalf of KUB which contained materials not listed on our original contract items. Approvals of the revised plans were submitted to Potter South East on September 10, 2012. New material orders were submitted immediately, but all materials for the plan revision were not received until February 29, 2013.
>
> . . . When materials were received the ground conditions would not allow for work to begin immediately due to wet weather conditions. The large concrete electric poles required also had to be set with multiple pieces of large equipment including a crane, excavator, and boom trucks. Also of a concern was the high voltage lines present in the work area where the concrete poles had to be lifted into place. With this being said, work could not commence until April 15, 2013.

The delays attributable to the relocation of the electrical lines took place in the same area near Beaver Creek where Classic City was to install the sixteen inch gas line. Notably, Potter did not attribute its need for an extension of time on account of Classic City's performance. Notwithstanding the entry of the change order, Potter did not finish its work on the project by December 13, 2014, and TDOT subsequently began assessing liquidated damages against it.

---

[4] Although the change order extended the project's completion date by 104 days, Potter had originally sought an extension of up to 350 days.

The litigation in this case commenced on July 2, 2013, when Classic City filed a complaint in the Knox County Chancery Court against Potter and Western Surety. Classic City asserted that it was owed over $500,000.00 plus interest for its work on the TDOT project and sought recovery under the subcontract between it and Potter, as well as under the payment bond executed by Potter and Western Surety. In addition, the complaint asserted claims for unjust enrichment, violations of the Prompt Pay Act of 1985 and Prompt Pay Act of 1991, and fraudulent concealment. Although the complaint named the TDOT Commissioner as a defendant in the case, Classic City did not seek any relief from TDOT "other than to demand that TDOT deposit into Court all amounts currently being withheld from Potter for piping work performed on the Project."

On August 19, 2013, both Potter and Western Surety filed responses to Classic City's complaint. The pleadings were styled as an "Answer, Counterclaim and Third Party Complaint" and concluded by requesting the court to award a "judgment against Classic City and The Guarantee Company for all damages sustained as a result of their breach of the contracts, including but not limited to the increased cost of obtaining a subcontractor to complete the work and additional administrative and overhead costs occasioned by the breach." Moreover, as part of their request for relief, both Potter and Western Surety prayed to recover liquidated damages. On August 28, 2013, the TDOT Commissioner filed his own answer to Classic City's complaint.

On September 18, 2013, Classic City filed an answer to Potter's counterclaim. Therein, Classic City contended that it was justified in terminating the subcontract following Potter's failure to pay Classic City for the work it performed on the project. Classic City also averred that the subcontract's liquidated damages provision was an unenforceable penalty. On April 30, 2014, the Guarantee Company raised these same defenses when it filed an answer to Potter's third-party complaint against it.

During the course of litigation, Classic City moved for partial summary judgment on Potter's claim for liquidated damages. According to Classic City, the provision of the subcontract relied upon by Potter for the assessment of liquidated damages amounted to an unenforceable penalty provision. The trial court agreed with Classic City's position on this issue, and by order dated September 24, 2014, it found that the subcontract's liquidated damages provision was unenforceable as a matter of law.

On October 21, 2014, Classic City filed an amended complaint wherein it increased its demand for the amount of compensatory damages allegedly owed to it. Later, on December 1, 2014, Potter filed a cross-claim against TDOT requesting a declaratory judgment regarding

the price it should be paid from TDOT for item #771M04.06.[5] Potter also filed an amended counterclaim against Classic City on that date seeking additional recovery to the extent that its compensation from TDOT was lowered due to Classic City's failure to properly install item #771M04.06. Classic City filed an answer to Potter's amended counterclaim on March 5, 2015.

In an agreed order entered *nunc pro tunc* to March 9, 2015, it was determined that the total compensation payable by TDOT to Potter for item numbers that Classic City had worked on was $582,717.86. Because TDOT had already paid Potter $177,593.83 of this amount, it interpleaded $405,124.03 on the following conditions: (1) no prejudgment interest would be awarded against TDOT, (2) Potter's cross-claim against TDOT would be dismissed, and (3) the TDOT Commissioner's counsel would still be permitted to participate in trial.

The trial in this matter was held over the course of four days in March 2015. At the time of the trial, Potter's work on the TDOT project had yet to be completed, and it continued to accrue liquidated damages assessed by TDOT. In general, proof at the trial focused on two areas of concern: (1) Potter's failure to pay Classic City for work that Classic City had performed and (2) Classic City's failure to complete work on the sixteen inch gas line by the fall of 2012.

Regarding the first issue, the proof demonstrated that Classic City had performed hundreds of thousands of dollars worth of work on the project. Specifically, Mr. Gibson testified that Potter owed Classic City over $477,000.00 for Classic City's performance under the subcontract. According to his testimony, this amount included over $75,000.00 for item #771M04.06.

For his part, Mr. Potter did not deny that his company had withheld payments from Classic City. Although he testified that he paid Classic City the first time that Classic City's work appeared on a TDOT pay estimate, he admitted that no additional payments were made to Classic City after that point. As revealed by the following exchange between Mr. Potter and Potter's counsel, Potter withheld payments due to its concerns with Classic City's performance:

Q. And why were the payments not made to Classic City?

---

[5] Potter amended its cross-claim on December 12, 2014.

A. Well, as I said earlier, I mean, this thing was larger than me, and I didn't have the answers. I knew that somebody else was going to have to sort through this thing and work it out.

Q. And what were the problems that you saw with Classic City's performance at that time?

A. We had been promised the moon, and it hadn't been delivered.

Q. Well, what problems did you see with regard to their actual performance?

A. Well, I mean, they didn't show up on time. They had, as Mr. Gibson stated today, they had welder problems. They had personnel problems. They had, evidently, more work than they could get done. You know, I don't know what all the problems is. I just know what went on there, and I know -- and I know - I mean, I had other subcontractors that were doing their work, and we -- You know, I mean, this ain't new to us and new to me. I can see the end result. And if you don't get these things into place early on when they're important to get in, it shows up in the end. And he -- you know, Classic City did not understand that part, and we stressed that, that they start in the beginning, that they start there and they start Brickyard is the two priorities of Classic City to begin work.

Q. At the time that payments to Classic City stopped, in the view of Potter South East, was Classic City in breach of the contract?

A. Absolutely.

Q. And in regard to the terms of the subcontract, what was your belief as to whether or not you were entitled to withhold payment?

A. Well, there's a paragraph in there that's in our favor. You know, if a subcontractor does not perform their duties and does not, I guess, show much interest, we have the right to stop payments is my understanding.

At another point in his testimony, Mr. Potter stated that he had withheld payments because of the "turmoil" in the project and contended that he "didn't know what to do." When Mr. Strunk testified about Potter's nonpayment to Classic City, he admitted that that he had previously testified by deposition that Potter stopped paying Classic City due to its imposition of liquidated damages.

- 11 -

In actuality, there was no real dispute at trial about the fact that Classic City had performed project tasks for which it received no compensation. Indeed, during the hearing of preliminary motions that were taken up by the court immediately prior to the commencement of trial, Potter's counsel stated as follows:

> The item numbers that have been identified, there is no dispute that they represent work that was completed by Classic City. Now, one thing that Counsel said was that those items were all properly payable to Classic City. That is disputed. It's disputed because Classic City, our position is, committed a breach of the contract, and it was the first material breach, precluding it from collecting compensation. And, of course, that will be a topic of this trial. But we do not agree that those items are payable to Classic City, but we do agree those items were completed by Classic City.

Thus, the heart of the dispute at trial was not whether Classic City had completed significant work under the subcontract. Rather, the real controversy was whether Classic City was entitled to any payment amidst Potter's allegations that it had delayed the project's completion.

Although neither the prime contract nor subcontract contained a master schedule or any interim milestones relative to the project, several witnesses testified about the importance of completing the installation of the sixteen inch line sometime before the onset of the 2013 year. Mr. Potter testified that it was "[v]ery important" that the sixteen inch gas line be installed promptly and stated that it was his objective to get the sixteen inch line installed in the 2012 year. A TDOT supervisor on the project, Duane Manning, testified that it would have been beneficial for Classic City to have installed the sixteen inch line early in the project; according to him, a possibility of delays existed if Classic City's work on the line was not completed in the fall of 2012. Moreover, Jeffrey Lusby ("Mr. Lusby"), a KUB inspector, testified that the sixteen inch line needed to be completed sometime in October 2012 before the cold weather arrived. According to Mr. Lusby, Classic City was aware of this need.

Although Classic City did not start on the sixteen inch line when requested by Potter, Mr. Gibson deflected much of the blame elsewhere. In part, he asserted that KUB failed to timely approve his material submittals. He testified that he sent Classic City's material submittals to KUB in "mid to late May" of 2012 and was forced to resubmit them in July of 2012 when he did not receive a response. He also offered testimony explaining Classic City's failure to have welders lined up for the project. According to Mr. Gibson, Classic City did not have welders on standby when it signed the subcontract because it was unknown when it would need to start its performance. As he stated, "[W]hen I signed the contract

- 12 -

March 29, I didn't know if I was starting June, September; it could be the following year. We had no clue." Although Mr. Gibson also testified that rainfall in the fall of 2012 and winter of 2013 prevented Classic City from working on the project, he did accept some responsibility regarding Classic City's lack of work on the project, at least as it pertained to the commencement of operations. According to his testimony, "there were issues to starting [the project], some with [Classic City], some with KUB."

Notwithstanding the difficulties that wet weather had posed to the sixteen inch line's completion, Mr. Gibson was adamant that Classic City would have been able to finish work on the line well before the fall of 2013 if it had not been forced to terminate the subcontract. He testified as follows on this point: "Again, if we were getting paid, we could have finished the project -- or the 16-inch steel -- summer of 2013, which would have been a year in advance of when they actually got it done with SEC." At another point during his trial testimony, Mr. Gibson specifically stated that Classic City could have completed its work on the sixteen inch line by "mid June 2013." He testified that "[o]nce the water was gone, [Classic City] could have come back in . . . and . . . tied it in."

Mr. Gibson's representations as to Classic City's ability to finish the work on the sixteen inch line are particularly noteworthy in light of other trial testimony that was presented. Kristin Qualls ("Ms. Qualls"), a TDOT engineer who assumed responsibility for the project in November 2013, testified that no delay on the project would have ultimately occurred if the work on the sixteen inch line had been completed before the end of the 2013 summer, or even well after then:

Q. All right. It's your position, isn't it, that we would not be in a situation where [liquidated damages] were being assessed against the contractor if this gas line work in and around the missing link was completed and energized or activated in late spring or early summer 2013?

A. I believe when I was talking through depositions, it would have had to been done before the winter months.

Q. The winter months of?

A. 2013. Going into 2014 is where we sat dormant.

Q. So if the gas line, the 16-inch line, had been complete in the summer of 2013, is it your opinion that the project would not be in a late situation or delayed, and that [liquidated damages] would not have been assessed against Potter?

- 13 -

A. I believe that could be a fair statement. I don't believe that it had to be summer, though. I mean, I think as long as they had been able to get a gas line complete before the winter months.

\* \* \* \*

Q. So if the gas line had been installed in June of 2013, it's your opinion that [liquidated damages] would not be applicable in this case?

A. That could be true.

Q. Could be true or is it your position?

A. In my opinion, June would have been fine for us to hit a target completion date of December 13, 2014.

Q. I'm going to write something down, and I'm going to ask you whether or not you agree with it. How about that? If the 16-inch line had been complete - - can you read that? -- mid June 2013, then no [liquidated damages] on the job.

A. I would agree with that statement. I'm not saying that is the requirement of when it would have had to be completed.

Q. Actually could have been completed after that?

A. True.

Ms. Qualls's position on this issue was also shared by one of Potter's experts, engineer David Chapman ("Dr. Chapman"), who holds a Ph.D. from the University of Tennessee. Dr. Chapman testified that the project would not have been delayed if the sixteen inch line had been installed in the summer of 2013.

Following the conclusion of trial, the trial court took the case under advisement. On June 15, 2015, it entered its findings of fact and conclusions of law in the case. Therein, the trial court concluded that Potter committed the first material breach of the subcontract by failing and refusing to pay Classic City for its work on the project. It also concluded that Potter failed to prove that Classic City breached the subcontract. In the alternative, the trial court concluded that even if Classic City had breached the subcontract, the breach was not material. The trial court expressly determined that Classic City did not cause any delay on the project to Potter. Moreover, it found that even if Classic City's failure to complete the

sixteen inch line in the fall of 2012 constituted the first material breach, Potter had waived its right to assert this breach as a bar to Classic City's recovery by allowing Classic City to continue working on the project. The trial court also concluded that Potter had failed to prove its alleged damages. Although the trial court ultimately held that Classic City was entitled to a monetary judgment against Potter and Western Surety, as well as interest under the Prompt Pay Act of 1991, it denied Classic City's request for attorney's fees.

On August 28, 2015, the trial court entered a final judgment in the case. Classic City was awarded a judgment against Potter and Western Surety, jointly and severally, in the amount of $477,233.19 for breach of contract and violation of the Prompt Pay Act of 1991. Pre- and post-judgment interest was set at a rate of 5.25% per annum, and the trial court dismissed all other causes of action asserted in the case. This appeal followed.

## ISSUES PRESENTED

In their brief on appeal, Potter and Western Surety raise the following issues for our review:

1. Whether the trial court erred in excusing Classic City's lengthy delay and ultimate non-performance.

2. Whether the trial court erred in concluding that Potter committed the first material breach of the subcontract.

3. Whether the trial court erred in concluding that Classic City did not breach the subcontract.

4. Whether the trial court erred in concluding that even if Classic City did breach the subcontract the breach was not material.

5. Whether the trial court erred in concluding that even if Classic City did breach the contract, and the breach was material, Potter waived its right to recover from Classic City by allowing it to continue to perform.

6. Whether the trial court erred in finding that Potter did not prove its damages.

Classic City and the Guarantee Company identify the following issues for review in their appellate brief:

- 15 -

1. Whether the trial court correctly held that only Potter South East, LLC and Western Surety Company were liable for breach of contract?

2. Whether the trial court correctly held that Potter South East, LLC failed to prove its damages?

3. Whether the trial court erred in dismissing Classic City Mechanical, Inc.'s claim for fraudulent concealment and failing to award punitive damages?

4. Whether the trial court erred in reducing the amount of interest owed to Classic City Mechanical to 5.25% per annum?

5. Whether the trial court erred in failing to award Classic City Mechanical, Inc. attorney's fees pursuant to the Prompt Pay Act of 1991?

Considered comprehensively, the parties' concerns can be distilled into the following primary issues:

1. Whether the trial court erred in granting Classic City a judgment while denying Potter's claims for damages.

2. Whether the trial court erred in dismissing Classic City's fraudulent concealment claim.

3. Whether the trial court erred in awarding Classic City interest at the rate of 5.25% per annum.

4. Whether the trial court erred in denying Classic City attorney's fees under the Prompt Pay Act of 1991.

**STANDARD OF REVIEW**

When reviewing a trial court's findings of fact, this Court applies the de novo standard of review contained in Tennessee Rule of Appellate Procedure 13(d). Under that rule, the trial court's findings of fact are accorded a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citations omitted). "We give great weight to the factual findings of the trial court which rest on determinations of witness credibility." *Sullivan v. Sullivan*, 107 S.W.3d 507,

- 16 -

510 (Tenn. Ct. App. 2002) (citation omitted). "Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). We will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Id.*

The presumption of correctness we afford to the trial court's factual findings is not applicable to our review of conclusions of law. In examining a trial court's resolution of legal issues, we review the issues de novo and reach our own independent conclusions. *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 414 (Tenn. 2013) (citations omitted). Although the interpretation of a contract is a question of law, the determination of whether a breach has occurred is a question of fact. *Regions Bank v. Thomas*, 422 S.W.3d 550, 560 (Tenn. Ct. App. 2013) (citations omitted).

## DISCUSSION

### *Propriety of granting relief to Classic City and denying Potter any recovery*

The central question in this appeal concerns whether the trial court erred in granting a judgment in Classic City's favor while denying any relief to Potter. For the reasons articulated below, we find no error in the trial court's judgment with respect to the compensatory damages that were awarded and denied.

As we have previously outlined, there is no dispute that Classic City performed a substantial amount of work on the TDOT project for which it was not paid. This fact notwithstanding, a dispute exists as to whether Classic City is entitled to recover compensation in light of delays that it allegedly caused to Potter's completion of the TDOT project. Potter maintains that it had the right to withhold payments from Classic City in order to offset damages that Classic City caused in its failure to perform the subcontract. It also maintains that Classic City's performance on the sixteen inch line caused a delay to Potter's completion of the overall project. At trial, Potter sought to recover multiple items of damages, including overhead damages based on Potter's representation that it could have finished its work by June 2014 absent Classic City's delay. On appeal, however, Potter asserts entitlement to two basic items of damages (1) additional costs incurred in replacing Classic City and finishing Classic City's work and (2) reimbursement for liquidated damages assessed by TDOT on account of Potter's failure to complete the project by the modified December 13, 2014 completion date. Whereas this first item of claimed damages is attributable to Classic City's decision to terminate the subcontract, the second item of damages is related to the alleged delay created by Classic City.

As already noted, several witnesses testified that it was important to complete the work on the sixteen inch line before the onset of the 2013 year. There was, however, no stated completion date for this work in the parties' contract. Indeed, neither the prime contract nor subcontract provided a schedule outlining when the work on the sixteen inch line needed to be completed. Even if a completion date for that work had been provided by contract, it does not necessarily mean that a failure to perform the work within the stated time period would amount to a material breach. Indeed, "[a] party's failure to complete a construction project within a time for completion does not constitute material breach absent a provision making time of the essence." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 818 (Tenn. Ct. App. 2009) (citation omitted). As a general rule, time is not of the essence in construction contracts. *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833 (Tenn. Ct. App. 1997) (citation omitted).

Although neither the prime contract nor subcontract contained a master schedule stating exactly when Classic City's work on the sixteen inch line needed to be performed, several witnesses testified that the sequencing for the project required that it occur before many other project tasks. Mr. Potter, for instance, testified that it was very important for the sixteen inch line to be installed promptly because multiple project tasks followed it:

> Well, the 16-inch gas [line] had to be installed, tied in, and then what that does is make room for a channel change, and then the -- of course, there was some bar excavation which creates the roadway. After you get to subgrade, you've got storm drain to install. You've got underdrain to install. You've got a -- you've actually got some more gas line to install in the same area; the 8-inch plastic that I referenced earlier also goes through the same area. And then you would have the curb and gutter, sidewalk, paving, striping, signage, sodding. I mean, you just -- the gas line actually gets you started at ground level, and you build all the way through to a finished product on top.

Ms. Qualls also testified as to the sequencing of the project and confirmed that work on the sixteen inch line needed to be finished before other project tasks could be accomplished.

According to Potter's experts, Dr. Chapman and engineer James Deatherage ("Dr. Deatherage"),[6] Potter could have met its original completion deadline if not for the delays associated with the sixteen inch line. In fact, they asserted that Potter would have finished early, likely in June 2014. However, Classic City's expert, construction consultant Andrew Englehart ("Mr. Englehart"), testified that Dr. Chapman and Dr. Deatherage had not performed an overall schedule analysis to determine the number of days of delay attributable

---

[6] Dr. Deatherage, like Dr. Chapman, holds a Ph.D. from the University of Tennessee.

to any particular factor. Moreover, Mr. Englehart noted that several tasks, which were wholly unrelated to Classic City's work, were still being performed after June 2014 anyways.

The testimony that Potter could have completed its work on the project by June 2014 was offered in support of Potter's request for overhead damages following June 1, 2014. Notably, this claim for damages has not been pursued on appeal. Rather, Potter's only claim for "delay" damages relates to its failure to complete the TDOT project by the modified completion deadline of December 13, 2014. At the time of trial, TDOT was still assessing liquidated damages against Potter based on Potter's failure to wrap up its performance by that date.

Although portions of the trial court's June 15, 2015 order suggest that Classic City did not breach any portion of the subcontract, this conclusion is not tenable. The trial court's own findings contradict the conclusion that no breach occurred. Indeed, the trial court expressly found that "[Classic City] did not promptly start and diligently prosecute the work [as required] under Article 4 of the subcontract."[7] Although Mr. Gibson testified that his material submittals had been delayed by KUB and provided reasons as to why he did not have welders lined up at the time he signed the subcontract, Classic City was required to commence work when requested by Potter. As such, Classic City bore the responsibility of having the workers needed to perform the tasks required of it. Moreover, it is undisputed that Classic City could have submitted its material submittals before being notified of its commencement date. Although Mr. Gibson provided several excuses regarding Classic City's commencement of performance, he also admitted Classic City was partially responsible. As previously noted, he testified that "there were issues to starting [the project], some with [Classic City], some with KUB."

The fact that Classic City did not promptly begin work, however, does not mean that it was in material breach of the subcontract. Several factors are relevant to determining whether a party's failure to perform is material. Among other things, courts consider the extent to which the injured party will be deprived of the expected benefit and the likelihood that the party failing to perform will cure its failure. *See Groner v. On-Site Grading, Inc.*, No. E1999-00219-COA-R3-CV, 2000 WL 502843, at * 4 (Tenn. Ct. App. Apr. 28, 2000) (citation omitted). Certainly, Classic City's failure to promptly start work does not in and of itself constitute a material breach if the overall project remained unimpeded. Indeed, if

---

[7] In addition to containing the liquidated damages provision that the trial court found to be unenforceable, Article 4 of the subcontract required Classic City to "commence work promptly or upon notice from [Potter]," to "prosecute the work diligently and so as to avoid delaying the progress of [Potter] or other subcontractors," and to "work 6 days a week or as instructed by [Potter]."

Classic City could have completed its performance within a reasonable time[8] and caused no damages to Potter, we fail to see how its failure to promptly start work constituted a material breach.

Although Potter frequently asserted that Classic City was in breach of the parties' subcontract following Classic City's commencement of performance, Potter continued to allow Classic City to work on the project. Moreover, despite the fact that TDOT paid Potter hundreds of thousands of dollars for work performed by Classic City under the subcontract, Potter only remitted a single payment to Classic City totaling slightly over $42,000.00. The law did not require Classic City to continue in its performance under these circumstances. "It is well settled that the failure to make progress payments on a construction contract constitutes a material breach of the contract." *Sanders v. Breath of Life Christian Church, Inc.*, No. W2010-01801-COA-R3-CV, 2012 WL 114279, at * 21 (Tenn. Ct. App. Jan. 13, 2012). Whereas the record therefore supports the trial court's conclusion that Potter materially breached the subcontract for failing to pay Classic City, there is insufficient evidence to conclude that Classic City materially breached the subcontract by failing to promptly begin its performance. In fact, the proof at trial showed that the project would not have been delayed had Classic City not been forced to terminate its work. According to Mr. Gibson's testimony, which the trial court noted was uncontradicted, Classic City could have installed and "tied in" the sixteen inch line by mid-June 2013 had it not been forced to terminate the subcontract for nonpayment. When this fact is considered in conjunction with the testimony of Ms. Qualls and certain admissions made by Dr. Chapman, one of Potter's experts, it is clear that Classic City did not actually contribute to any delay. Indeed, according to Ms. Qualls and Dr. Chapman, the project's completion deadline would have been met had the sixteen inch line been installed in the summer of 2013. Ms. Qualls even testified that the project might have experienced no delays if the sixteen inch line had been installed in the fall of 2013. There is thus no basis for Potter's delay damages claim, and we conclude the trial court committed no error in finding that Classic City did not materially breach the subcontract and that Classic City's lack of promptness did not cause any damages to Potter.

Likewise, there is no basis for Potter's claim to recover costs it incurred in replacing Classic City's work. As previously noted, Potter materially breached the subcontract when it failed to pay Classic City for substantial work that Classic City performed under the subcontract. Classic City was therefore justified in ceasing its operations and terminating the subcontract. Obviously, had Classic City not been forced to terminate the contract for nonpayment, Potter would never have had to engage SEC to finish the work. Thus, although

---

[8] "If there is no agreed date for completion, courts may imply a reasonable time for performance." *Madden Phillips Constr., Inc.*, 315 S.W.3d at 822 (citation omitted).

- 20 -

there is no question that Potter incurred additional costs as a result of Classic City's termination of the subcontract, Classic City should not be held liable for them. Again, Classic City did not act improperly in terminating its performance.

### Classic City's claim for fraudulent concealment

In its brief on appeal, Classic City asserts that the trial court erred in dismissing its claim for fraudulent concealment. "The tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538-39 (Tenn. 1998) (citations omitted). For the nondisclosure to constitute fraud, the concealed fact or condition must be a material fact. *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012) (citation omitted). Moreover, "a plaintiff's damages must have been caused by his reasonable reliance on the nondisclosure, i.e., the plaintiff was not aware of the material fact and would have acted differently if the plaintiff knew of the concealed or suppressed fact." *Id.* at 551 (citations omitted).

According to Classic City, Potter's fraudulent concealment was established through its failure to tell Classic City that it did not intend to pay Classic City for work it had performed.[9] Indeed, in its brief, Classic City argues as follows:

> Potter purposefully concealed from [Classic City] that Potter was representing to TDOT that it did not intend to pay [Classic City] for the work it was performing on the Project. Potter submitted Prompt Pay Certifications to TDOT in which it indicated that it was not paying [Classic City] because the parties were "under litigation" (even though no lawsuit had been filed). . . . At no time, however, did Potter advise [Classic City] that it was representing to TDOT in the Prompt Pay Certificates that the parties were "under litigation" and that it was intentionally not forwarding on payments to [Classic City] that Potter was receiving from TDOT for [Classic City's] work.

In contending that harm resulted from this nondisclosure, Classic City argues that it would have stopped work sooner and relocated its forces to other projects had it been made aware of the representations Potter provided to TDOT.

---

[9] In its brief, Classic City notes that a duty of good faith exists in the performance and enforcement of every contract, and by quoting *Simmons v. Evans*, 206 S.W.2d 295 (Tenn. 1947), it argues that each party to a contract is required to disclose to the other party all that he or she may know which materially affects a correct view of the subject matter. *See id.* at 296.

Although Classic City asserts that it would have stopped working on the project earlier if Potter had informed it of the representations made in the prompt pay certifications to TDOT, the trial court dismissed the fraudulent concealment claim by noting that "[Classic City] knew that it was not being paid for its work." We agree with the trial court that the asserted fraudulent concealment claim is without merit. Although Classic City may not have known about Potter's specific, albeit inaccurate, representations to TDOT that the parties were "Under Litigation," it already had knowledge of the essence of what was conveyed by Potter's communications. As the trial court found, Classic City knew that it was not being paid. Moreover, Classic City knew that Potter was asserting an entitlement to liquidated damages for Classic City's alleged nonperformance. As early as August of 2012, Classic City knew that Potter was threatening it with liquidated damages. Moreover, by letter dated February 11, 2013, Potter specifically informed Classic City that it was subject to liquidated damages. Although Classic City subsequently inquired about outstanding payments, we note that Potter informed Mr. Gibson by email that payments would only be distributed after Potter consulted with its counsel regarding the issues of liquidated damages.

Even Mr. Gibson's trial testimony indicates an awareness that Potter's claim to liquidated damages was impacting Potter's failure to pay Classic City. When asked if Mr. Potter ever informed him why Potter was not paying Classic City, Mr. Gibson stated as follows: "Well, he didn't really respond, but in his letters, obviously, he's writing liquidated damages and charging 5,350 per day." Subsequent to this statement, Mr. Gibson went on to explain how Potter's claimed entitlement to liquidated damages was effecting his bottom line: "So 5,350 per calendar day, and I think we established that's around 160,000 a month, and we were probably billing March, April, May in that 150-160,000 a month basis, so we were basically working for free."

In light of the foregoing, it is clear that Classic City was well aware that it was not being paid, and it should have been apparent to it that Potter was withholding funds due to a perceived legal issue. Potter's representations to TDOT communicated this same information, albeit while inaccurately stating that the parties were then involved in litigation. "'Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded.'" *Bevins v. Livesay*, 221 S.W.2d 106, 109 (Tenn. Ct. App. 1949) (quoting *Freeman v. Citizens' Nat'l Bank*, 70 S.W.2d 25, 29 (Tenn. 1934)). Here, the proof shows that Classic City was already aware that there was a dispute regarding its entitlement to payments. As such, we fail to see how Potter's failure to inform Classic City of the specific representations it made to TDOT can serve as the basis for Classic City's fraudulent concealment claim.[10]

---

[10] Classic City also argues in its brief that Potter concealed certain representations made to TDOT concerning delays to the project. Specifically, whereas Potter did not attribute the cause of delays to Classic City in its

***Whether the trial court erred in awarding Classic City interest at the rate of 5.25% per annum***

In its June 15, 2015 order, the trial court determined that Classic City was entitled to interest under the Prompt Pay Act of 1991, which is codified at Tennessee Code Annotated section 66-34-101, *et seq.* Rather than determine a specific rate of interest that was applicable, however, the trial court's June 15 order stated that interest should be awarded at the rate of "10% or 5.25% [per annum]." In relevant part, the trial court noted as follows:

> 219: [Classic City] provided all required notice to Potter and Western of [Classic City's] intent to seek recovery under the Prompt Pay Act of 1991, Tennessee Code Annotated § 66-34-101, *et seq.*
>
> 220. The Prompt Pay Act of 1991 also provides that any payments that are not made in accordance with the Act shall accrue interest from the date the payment was due through the date payment is made at the rate of interest for delinquent payments provided in [the] written contract or, if no interest rate is specified in a written contract, at the rate specified in Tennessee Code Annotated § 47-14-121. *See* Tenn. Code Ann. § 66-34-601.
>
> 221. The interest rate under Tennessee Code Annotated § 47-14-121 was 10% until July 1, 2012, when the statute was amended to apply a new formula. The rate has remained set at 5.25% since July 1, 2012.

When it entered its final judgment in the case on August 28, 2015, the trial court ultimately concluded that pre- and post-judgment interest should be set at 5.25% per annum. The trial court's reasoning, which was included in an "Addendum to Final Judgment," was as follows:

> The Prompt Pay Act of 1991 provides for interest "at the rate specified in § 47-14-121." The parties entered into the Subcontract on March 28, 2012. T.C.A.

---

various communications with TDOT, Classic City notes that Potter personally accused it of being the cause of the delays. From our review of Classic City's brief, it is somewhat unclear what harm Classic City contends resulted from Potter's failure to inform it of the contents of the TDOT communications concerning delay. However, in its proposed findings of fact and conclusions of law filed with the trial court after the conclusion of trial, Classic City submitted as follows: "Had [Classic City] known that Potter took the position with TDOT that the Project was delayed because of the electrical line relocation, Potter's intent to never pay [Classic City] would have become known much sooner and would have resulted in [Classic City] terminating the Subcontract earlier." As we have already explained, however, Classic City knew that it was not receiving payment, and it knew that Potter was asserting an entitlement to liquidated damages that could serve to offset any payments otherwise owed to it.

- 23 -

§ 47-14-121, effective March 27, 2008 to June 30, 2012, specified an interest rate of 10%. Effective July 1, 2012, the statute provided a new formula resulting in a rate of 5.25%. The allowance of prejudgment interest is an equitable measure to make the prevailing party whole. See 16 Tenn. Juris., Interest § 7. The circumstances and equities of this case support the allowance of prejudgment interest at the rate of 5.25%.

On appeal, Classic City maintains that the trial court's award of interest at 5.25% per annum was in error. According to Classic City, Potter contractually agreed to pay interest at a rate of 1.5% per month. Alternatively, Classic City argues that it is entitled to interest at the rate of 10% per annum, the amount provided for by Tennessee Code Annotated section 47-14-121 as of the date that the subcontract was signed. For their part, Potter and its surety assert that the subcontract does not specify a rate of interest. Moreover, they contend that the trial court committed no error in charging 5.25% per annum.

Having reviewed the record transmitted to us on appeal, we agree with Classic City's position that the trial court erred in failing to award interest at the rate of 1.5% per month. Under the Prompt Pay Act of 1991, interest accrues on payments "at the rate of interest for delinquent payments provided in [the] written contract or, if no interest rate is specified in a written contract, at the rate specified in § 47-14-121." Tenn. Code Ann. § 66-34-601 (2015). Here, because the subcontract provides for a contractual rate of interest, interest should not be assessed pursuant to Tennessee Code Annotated section 47-14-121. Rather, interest should be assessed in accordance with what is provided for in the subcontract.

In this case, the applicable interest rate is established through two layers of incorporation. As previously noted, the subcontract incorporates the terms and conditions of the prime contract by reference; on the issue of interest, the prime contract then specifically incorporates Tennessee Code Annotated section 12-4-707(b). The establishment of this contractual rate of interest is evident from the following payment provision, which we have cited previously:

The prime contractor must pay each subcontractor for work performed under its subcontract no later than 30 days from the date the prime contractor receives payment for the work from the Department. The prime contractor must pay each material supplier for materials supplied to the project no later than 30 days from the date the prime contractor receives payment for the material from the Department. . . . The prime contractor shall provide monthly payment certification to the Department entitled "Prompt Payment Certification Form". An officer of the prime contractor shall sign the "Prompt Payment Certification Form". The Department will withhold estimate

- 24 -

payments if information is not submitted. The Department will withhold estimate payments for subcontracted items if subcontractors, at any tier, or materials suppliers are not paid. Also, all required certifications must be in the field office and accepted before such work is deemed satisfactorily completed. **Any delay or postponement of payment from the above referenced time frame will result in accrual of interest as provided under TCA, Section 12-4-707(b)**.

(emphasis added).

The referenced statutory provision, which itself specifically governs interest due under the Prompt Pay Act of 1985, provides that interest shall accrue "at the rate of one and one-half percent . . . per month." Tenn. Code Ann. § 12-4-707 (b) (2011). Because the Prompt Pay Act of 1991 states that interest shall accrue at the rate of interest provided for in the written contract if one is provided, *see* Tenn. Code Ann. § 66-34-601,[11] and the subcontract in this case incorporates by reference the interest rate provided for in Tennessee Code Annotated section 12-4-707(b), the trial court should have awarded interest at the rate of 1.5% per month. We are, therefore, modifying the trial court's judgment as to its award of interest and remanding the case to the trial court for a recalculation of interest in accordance with this Opinion.

### *Attorney's Fees*

Classic City also challenges the trial court's denial of its claim for attorney's fees under the Prompt Pay Act of 1991. Pursuant to that statute, "[r]easonable attorney's fees may be awarded against the nonprevailing party; provided, that such nonprevailing party has acted in bad faith." Tenn. Code Ann. § 66-34-602(b) (2015). Because the statute does not mandate an award of attorney's fees, we review the trial court's decision regarding the issue for an abuse of discretion. *Madden Phillips Constr., Inc.*, 315 S.W.3d at 827. "The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citation omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

---

[11] The same is true regarding interest specifically owed under the Prompt Pay Act of 1985. *See* Tenn. Code Ann. § 12-4-707(b) (noting that interest accrues at the rate of one and one-half percent per month "unless otherwise provided by contract").

Although a finding of bad faith is a prerequisite to an award of attorney's fees under the statute, what constitutes bad faith is not statutorily defined. Previous courts have determined that "acts taken in bad faith involve knowing or reckless disregard for contractual rights or duties." *Madden Phillips Constr., Inc.*, 315 S.W.3d at 829 (citation omitted). Moreover, in *Trinity Industries, Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001), we affirmed a trial court's finding that a company had not acted in bad faith when we concluded that we had "no doubt that [the company's] principals honestly believed that their company did not owe the money claimed by [the plaintiff]." *Id.* at 181. Our courts "have recognized in various contexts that the presence of bad faith is a question of fact." *Madden Phillips Constr., Inc.*, 315 S.W.3d at 828 (citations omitted). Because factual determinations related to bad or good faith "often turn on credibility," they may be "entitled to a high degree of deference on appeal." *Id.* at 829 (citation omitted).

In this case, Mr. Potter testified that he withheld payments from Classic City due to his concerns with Classic City's performance. In part, his testimony on this issue was as follows:

> Q. At the time that payments to Classic City stopped, in the view of Potter South East, was Classic City in breach of the contract?
>
> A. Absolutely.
>
> Q. And in regard to the terms of the subcontract, what was your belief as to whether or not you were entitled to withhold payment?
>
> A. Well, there's a paragraph in there that's in our favor. You know, if a subcontractor does not perform their duties and does not, I guess, show much interest, we have the right to stop payments is my understanding.

In rejecting Classic City's request for attorney's fees, the trial court implicitly accredited Mr. Potter's testimony concerning Potter's belief on its right to withhold payments:

> [T]he Court does not find nor conclude that the refusal of Potter and Western to pay [Classic City] for the work [Classic City] performed on the Project was done in bad faith. By reason of [Classic City's] violations of Article 4 of the contract in not promptly commencing the work and not diligently prosecuting the work, the defendant Potter had a legitimate dispute with [Classic City].

Again, bad faith is not present if a company "honestly believed" that it did not owe the disputed payments. *See Trinity Indus., Inc.*, 77 S.W.3d at 181. Here, the trial

court's findings indicate that it was of the opinion that Potter thought it was acting justifiably in light of Classic City's slow start on the project.

As we have noted, a finding of good or bad faith is a factual determination that depends, in large part, on a trial court's assessment of witness credibility. *Madden Phillips Constr., Inc.*, 315 S.W.3d at 829 (citation omitted). In this case, Classic City has not shown clearly and convincingly that the trial court's determination was in error. Accordingly, we affirm the trial court's denial of Classic City's claim for attorney's fees.

## CONCLUSION

We affirm the trial court's judgment except for its award of interest. The assessment of interest at 5.25% per annum was in error, as the contractual agreement between the parties provided that interest should be assessed, pursuant to Tennessee Code Annotated section 12-4-707 (b), at the rate of 1.5% per month. Accordingly, we remand this case to the trial court for a recalculation of the awarded interest in accordance with this Opinion. Costs of this appeal are assessed against Potter South East, LLC, and Western Surety Company, and their surety, for which execution may issue if necessary. This case is remanded to the trial court for the collection of costs, enforcement of the judgment, and for such further proceedings as are necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE